(No. 68585.—▮▮▮)

QUAKE CONSTRUCTION, INC., Appellee, v. AMERICAN AIRLINES, INC., *et al.*, Appellants.

*Opinion filed December 3, 1990.*

STAMOS, J., specially concurring.

David M. Meister, Peter Petrakis and Barbara J. Stuetzer, of Katten, Muchin & Zavis, of Chicago, for appellants.

Richard D. Heytow, of Crystal and Heytow, P.C., of Chicago, for appellee.

JUSTICE CALVO delivered the opinion of the court:

Plaintiff, Quake Construction, Inc. (Quake), filed a four-count, third-amended complaint against defendants,

American Airlines, Inc. (American), and Jones Brothers Construction Corporation (Jones). In count I, plaintiff sought damages for breach of contract. Plaintiff based counts II, III and IV on detrimental reliance, waiver of condition precedent, and impossibility of contract, respectively. Upon defendants' motion, the circuit court of Cook County dismissed the complaint with prejudice, pursuant to section 2—615 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—615). On appeal, the Appellate Court, First District, with one justice dissenting, reversed the dismissal of counts I, II and III, affirmed the dismissal of count IV, and remanded the cause to the circuit court. (181 Ill. App. 3d 908.) We granted defendants' petition for leave to appeal (107 Ill. 2d R. 315).

Quake alleged in its complaint the following facts. In February 1985, American hired Jones to prepare bid specifications, accept bids, and award contracts for construction of the expansion of American's facilities at O'Hare International Airport. Quake received an invitation to bid on the employee facilities and automotive maintenance shop project (hereinafter referred to as the project), and in April 1985 submitted its bid to Jones. Jones orally notified Quake that Quake had been awarded the contract for the project. Jones then asked Quake to provide the license numbers of the subcontractors Quake intended to use on the project. Quake notified Jones that the subcontractors would not allow Quake to use their license numbers until Quake submitted a signed subcontract agreement to them. Jones informed Quake that Quake would shortly receive a written contract for the project prepared by Jones. To induce Quake to enter into agreements with its subcontractors and to induce the subcontractors to provide Quake and Jones with their license numbers, Jones sent Quake the following letter of intent dated April 18, 1985:

"We have elected to award the contract for the subject project to your firm as we discussed on April 15, 1985. A contract agreement outlining the detailed terms and conditions is being prepared and will be available for your signature shortly.

Your scope of work as the general contractor includes the complete installation of expanded lunchroom, restroom and locker facilities for American Airlines employees as well as an expansion of American Airlines existing Automotive Maintenance Shop. The project is located on the lower level of 'K' Concourse. A sixty (60) calendar day period shall be allowed for the construction of the locker room, lunchroom and restroom area beginning the week of April 22, 1985. The entire project shall be complete by August 15, 1985.

Subject to negotiated modifications for exterior hollow metal doors and interior ceramic floor tile material as discussed, this notice of award authorizes the work set forth in the following documents at a lump sum price of $1,060,568.00.

a) Jones Brothers Invitation to Bid dated March 19, 1985.

b) Specifications as listed in the Invitation to Bid.

c) Drawings as listed in the Invitation to Bid.

d) Bid Addendum #1 dated March 29, 1985.

Quake Construction Inc. shall provide evidence of liability insurance in the amount of $5,000,000 umbrella coverage and 100% performance and payment bond to Jones Brothers Construction Corporation before commencement of the work. The contract shall include MBE, WBE and EEO goals as established by your bid proposal. Accomplishment of the City of Chicago's residency goals as cited in the Invitation to Bid is also required. As agreed, certificates of commitment from those MBE firms designated on your proposal modification submitted April 13, 1985, shall be provided to Jones Brothers Construction Corporation.

Jones Brothers Construction Corporation reserves the right to cancel this letter of intent if the parties cannot agree on a fully executed subcontract agreement."

Jones and Quake thereafter discussed and orally agreed to certain changes in the written form contract. Handwritten delineations were made to the form contract by Jones and Quake to reflect these changes. Jones advised Quake it would prepare and send the written contract to Quake for Quake's signature. No such formal written contract, however, was entered into by the parties.

At a preconstruction meeting on April 25, 1985, Jones told Quake, Quake's subcontractors, and governmental officials present that Quake was the general contractor for the project. On that same date; immediately after the meeting, American informed Quake that Quake's involvement with the project was terminated. Jones confirmed Quake's termination by a letter dated April 25, 1985. The damages Quake allegedly suffered included the money it spent in procuring the contract and preparing to perform under the contract, and its loss of anticipated profit from the contract.

The main issue is whether the letter of intent from Jones to Quake is an enforceable contract such that a cause of action may be brought by Quake. This court has previously set forth the principles of law concerning the enforceability of letters of intent:

> "The fact that parties contemplate that a formal agreement will eventually be executed does not necessarily render prior agreements mere negotiations, where it is clear that the ultimate contract will be substantially based upon the same terms as the previous document. [Citation.] If the parties *** intended that the *** document be contractually binding, that intention would not be defeated by the mere recitation in the writing that a more formal agreement was yet to be drawn. However, parties may specifically provide that negotiations are not binding until a formal agreement is in fact executed. [Citation.] If the parties construe the execution of a formal agreement as a condition precedent, then no contract arises unless and until that formal agreement is exe-

cuted." *Chicago Investment Corp. v. Dolins* (1985), 107 Ill. 2d 120, 126-27.

See *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.* (1986), 114 Ill. 2d 133, 143-44.

The *Chicago* court merely reiterated the rule established over 85 years ago:

> " 'Where the parties make the reduction of the agreement to writing, and its signature by them, a condition precedent to its completion, it will not be a contract until that is done. And this is true although all the terms of the contract have been agreed upon. But where the parties have assented to all the terms of the contract, the mere reference to a future contract in writing will not negative the existence of a present contract.' " (*Baltimore & Ohio Southwestern R.R. Co. v. People ex rel. Allen* (1902), 195 Ill. 423, 428, quoting 7 Am. & Eng. Enc. L. 140 (2d ed. 1898).)

(See *Chicago Title & Trust Co. v. Ceco Corp.* (1980), 92 Ill. App. 3d 58, 69-70; *Interway, Inc. v. Alagna* (1980), 85 Ill. App. 3d 1094, 1097-98.) Thus, although letters of intent may be enforceable, such letters are not necessarily enforceable unless the parties intend them to be contractually binding. *Interway*, 85 Ill. App. 3d at 1098.

A circuit court must initially determine, as a question of law, whether the language of a purported contract is ambiguous as to the parties' intent. (*Interway*, 85 Ill. App. 3d at 1098.) If no ambiguity exists in the writing, the parties' intent must be derived by the circuit court, as a matter of law, solely from the writing itself. (*Interway*, 85 Ill. App. 3d at 1098; see *Schek v. Chicago Transit Authority* (1969), 42 Ill. 2d 362, 364.) If the terms of an alleged contract are ambiguous or capable of more than one interpretation, however, parol evidence is admissible to ascertain the parties' intent. (*Borg-Warner Corp. v. Anchor Coupling Co.* (1958), 16 Ill. 2d 234, 242; *Interway*, 85 Ill. App. 3d at 1098.) If the language of an alleged contract is ambiguous regarding the parties' in-

tent, the interpretation of the language is a question of fact which a circuit court cannot properly determine on a motion to dismiss. *Interway*, 85 Ill. App. 3d at 1098.

In determining whether the parties intended to reduce their agreement to writing, the following factors may be considered: whether the type of agreement involved is one usually put into writing, whether the agreement contains many or few details, whether the agreement involves a large or small amount of money, whether the agreement requires a formal writing for the full expression of the covenants, and whether the negotiations indicated that a formal written document was contemplated at the completion of the negotiations. (*Ceres*, 114 Ill. 2d at 144; *Chicago*, 107 Ill. 2d at 124.) Other factors which may be considered are: "where in the negotiating process that process is abandoned, the reasons it is abandoned, the extent of the assurances previously given by the party which now disclaims any contract, and the other party's reliance upon the anticipated completed transaction." *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.* (N.D. Ill. 1988), 678 F. Supp. 193, 196, *aff'd* (7th Cir. 1989), 873 F.2d 155.

A motion to dismiss a complaint admits all well-pleaded facts, but does not admit conclusions of law or conclusions of fact not supported by allegations of specific facts. (*Pierce v. Carpentier* (1960), 20 Ill. 2d 526, 531.) Any reasonable inferences which may be drawn from such well-pleaded facts, however, must be taken as true for purposes of the motion. (*Interway*, 85 Ill. App. 3d at 1097.) "A cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to recover." (*Walker v. Rumer* (1978), 72 Ill. 2d 495, 502; *Interway*, 85 Ill. App. 3d at 1097.) On appeal from the dismissal of a complaint, "a reviewing court should

interpret the facts alleged in the complaint in the light most favorable to the plaintiff." *Interway*, 85 Ill. App. 3d at 1097.

The circuit court in the case at bar dismissed Quake's complaint, relying principally on the following sentence in the letter: "Jones Brothers Construction Corporation reserves the right to cancel this letter of intent if the parties cannot agree on a fully executed subcontract agreement" (hereinafter referred to as the cancellation clause). The parties agreed during oral arguments that the subcontract agreement referred to in the cancellation clause concerned an agreement between Jones and Quake. Jones was the general contractor for the entire expansion project. Jones hired Quake as a subcontractor to handle only the work on the employee facilities and automotive shop. Quake, in turn, hired subcontractors to perform this work. The circuit court determined, based on the cancellation clause, that the parties agreed not to be bound until they entered into a formal written contract. Consequently, the circuit court held that the letter was not an enforceable contract and accordingly dismissed the complaint.

The appellate court, however, found the letter ambiguous. The appellate court explained:

"In the 'Letter of Intent,' Jones Brothers stated that it had 'elected to award the contract for the subject project to [plaintiff's] firm.' Jones Brothers then described the scope of work required of plaintiff as the general contractor for the Project. Jones Brothers gave the location of the Project and the time schedule for the Project. Jones Brothers also stated that 'this notice of award authorizes the work set forth in the following documents at a lump sum price of $1,060,568.00.' (The list of documents is omitted.) Jones Brothers also stated that plaintiff 'shall provide evidence of liability insurance' and certificates of commitment from MBE firms designated in plaintiff's proposal modification of April 13, 1985. These statements

evince the intent of the parties to be bound by the 'Letter of Intent.' (*See Chicago Investment Corp.*, 93 Ill. App. 3d at 975 (court held that letter of intent did not 'unambiguously demonstrate that the parties to it did not intend to be bound thereby.' The letter contained a description of the properties, the total price, the earnest money amount and certain other terms.)) The schedule for completion of the Project supports this construction of the 'Letter of Intent.' The 'Letter of Intent' is dated April 18, 1985. However, Jones Brothers stated in the 'Letter of Intent' that work was to begin 'the week of April 22, 1985, and must be completed by August 15, 1985.' A reasonable inference from these facts is that the parties intended that work on the Project would begin prior to execution of a formal contract and would be governed by the terms of the 'Letter of Intent.'

On the other hand, Jones Brothers stated in the 'Letter of Intent' that a 'contract agreement outlining the detailed terms and conditions is being prepared and will be available for [plaintiff's] signature shortly.' Jones Brothers also stated that the contract 'shall include MBE, WBE and EEO goals as established by [plaintiff's] bid proposal.' These statements support the construction that the parties did not intend to be bound by the 'Letter of Intent.'

The 'Letter of Intent' then concludes with the statement that 'Jones Brothers Construction Corporation reserves the right to cancel this letter of intent if the parties cannot agree on a fully executed subcontract agreement.' This statement is itself ambiguous and supports both constructions of the 'Letter of Intent.' The statement may be construed as a condition precedent which would prevent formation of a contract if the parties could not agree on the terms of the contract. However, there would be little need to provide for cancellation of the 'Letter of Intent' if the parties did not intend to be bound by it. Further, the statement implies that the parties could be bound by the 'Letter of Intent' in the absence of a fully executed subcontract agreement." (181 Ill. App. 3d at 913-14.)

Thus, the appellate court disagreed with the circuit court and held that a question of fact existed with regard to the parties' intent. (181 Ill. App. 3d at 914.) The appellate court held further that "a determination of the parties' intent could not have been made solely on the basis of the 'Letter of Intent.'" (181 Ill. App. 3d at 914.) The appellate court stated the circuit court "should have considered parol evidence in making its determination." (181 Ill. App. 3d at 914.) Therefore, the appellate court reversed the circuit court's dismissal of the complaint and remanded the cause to the circuit court. 181 Ill. App. 3d at 916.

Justice McNamara, in his dissent from the opinion of the appellate court majority, stated "the letter of intent unambiguously demonstrates the parties' intent to make the execution of a formal agreement a condition precedent to a binding contract." (181 Ill. App. 3d at 916 (McNamara, J., dissenting).) Therefore, Justice McNamara stated he would have affirmed the circuit court's dismissal of the complaint. Justice McNamara asserted the cancellation clause clearly and unambiguously demonstrated the parties' intent not to be bound by the letter, and he noted several courts have found such language unambiguous. According to Justice McNamara, the detailed terms of the agreement set forth in the letter "reveal nothing more than the tentative, inconclusive nature of the agreement." (181 Ill. App. 3d at 918 (McNamara, J., dissenting).) He asserted that such terms are usually included in any initial request for bids, and he pointed to several cases where courts found letters of intent unambiguous even though the letters included considerably detailed information regarding the terms of the agreements. 181 Ill. App. 3d at 918 (McNamara, J., dissenting).

The dissent also disputed the majority's conclusion that the parties intended the work to begin prior to the execution of the formal contract and would be governed by the terms of the letter. Justice McNamara stated that even though the letter was dated April 18 and work was to begin the week of April 22, the letter indicated the contract would be available for Quake's signature " 'shortly.' " (181 Ill. App. 3d at 919 (McNamara, J., dissenting).) The dissent noted that a "letter of intent may authorize subcontractors to proceed without waiving the express conditions precedent to a binding contract." 181 Ill. App. 3d at 919 (McNamara, J., dissenting).

Justice McNamara, in addition, disagreed with the majority's statement that the parties would not have needed to provide for the cancellation of the letter of intent unless they had intended to be bound by the letter. According to Justice McNamara, one function of a letter of intent is to allow parties to agree to the course of, and discontinuance of, their negotiations. (181 Ill. App. 3d at 919 (McNamara, J., dissenting).) Justice McNamara went on to distinguish *Inland Real Estate Corp. v. Christoph* (1981), 107 Ill. App. 3d 183, a case on which the majority relied. The letter was not a contract, Justice McNamara concluded, but rather "some lesser undertaking by the parties and a precursor to a valid and enforceable agreement." 181 Ill. App. 3d at 920 (McNamara, J., dissenting).

We agree with the appellate court majority's analysis and its conclusion that the letter was ambiguous. Consequently, we affirm the decision of the appellate court. The letter of intent included detailed terms of the parties' agreement. The letter stated that Jones awarded the contract for the project to Quake. The letter stated further "this notice of award authorizes the work." Moreover, the letter indicated the work was to commence approximately 4 to 11 days after the letter was

written. This short period of time reveals the parties' intent to be bound by the letter so the work could begin on schedule. We also agree with the appellate court that the cancellation clause exhibited the parties' intent to be bound by the letter because no need would exist to provide for the cancellation of the letter unless the letter had some binding effect. The cancellation clause also implied the parties' intention to be bound by the letter at least until they entered into the formal contract. We agree with the appellate court that all of these factors evinced the parties' intent to be bound by the letter.

On the other hand, the letter referred several times to the execution of a formal contract by the parties, thus indicating the parties' intent not to be bound by the letter. The cancellation clause could be interpreted to mean that the parties did not intend to be bound until they entered into a formal agreement. Therefore, the appellate court correctly concluded that the letter was ambiguous regarding the parties' intent to be bound by it.

Defendants contend the letter of intent did not contain all of the terms necessary for the formation of a construction contract. Defendants assert construction contracts typically include terms regarding payment, damages and termination. Defendants argue the detail in the contract is usually extensive if the value and complexity of the construction project are great. Defendants also note the letter stated the contract would include the detailed terms and conditions of the parties' agreement. The letter indicated *the contract* would include the MBE, WBE and EEO (Minority Business Enterprise, Women's Business Enterprise, and Equal Employment Opportunity, respectively) goals established by Quake's bid proposal. Defendants point out the letter stated certain terms of the agreement still had to be negotiated. Without the formal contract, defendants assert, the parties could not have continued toward the completion of the

project because the letter excluded many terms of the agreement which would have been included in the contract. Defendants thus argue the absence in the letter of all the terms of the agreement reveals the parties' intent not to be bound by the letter.

The appellate court stated the number and extent of the terms in the letter can indicate the parties' intent to be bound by the letter. The final contract only need be *substantially based* on the terms in the letter as long as the parties intended the letter to be binding. (*Chicago*, 107 Ill. 2d at 126-27.) Many of the details regarding the project were included in the letter. The letter adopted by reference the contents of certain documents which included even further details concerning the project. We agree Jones accepted the MBE, WBE and EEO goals established by Quake. The letter merely indicated that those goals would be reiterated in the contract. We acknowledge that the absence of certain terms in the letter indicates the parties' intent not to be bound by the letter. This only confirms our holding that the letter is ambiguous as to the parties' intent.

Defendants and the appellate court dissent cited several cases they contend found language requiring a formal contract unambiguous. They also contend the letter of intent contained very detailed terms of the agreement in those cases. (See 181 Ill. App. 3d at 918 (McNamara, J., dissenting).) We have reviewed these cases and find them distinguishable on their facts.

Defendants express concern upholding of the appellate court's decision will cause businesses to put few details in letters of intent so as not to risk a court's interpreting such letters as contracts. Defendants contend terms, such as the scope of work, location and time schedule, are typically included in nonbinding documents for construction projects (*e.g.*, requests for bids). Defendants assert that preliminary discussions regarding con-

struction projects would be meaningless without reference to some basic information. Thus, defendants argue the purpose of letters of intent is defeated if few details can be included in the letters.

We understand defendants' concern. Nevertheless, under the law, the parties' intent determines whether a letter of intent is an enforceable contract. The extent of the terms of the agreement in the letter is one factor to consider in discerning that intent. The particular facts in each case are significant. The only way to allay defendants' fears is to change the law; we are unwilling to do this.

Defendants contend even if the letter contained all of the essential terms of a contract, the cancellation clause negated any inference that the parties intended to be bound by the letter. The clause, according to defendants, clearly established the parties' intent not to be so bound. Defendants argue the letter only sets forth the provisions which would be included in the contract if one is ever executed. Defendants point out both the circuit court and the appellate court dissent found the cancellation clause unambiguously declared the parties' intent not to be bound until the parties entered into a formal contract.

We do not find defendants' argument persuasive. The appellate court stated that, in addition to the detailed terms of the parties' agreement, the letter also contained a sentence in which Jones said it awarded the contract for the project to Quake. Moreover, the letter stated "this notice of award *authorizes* the work." (Emphasis added.) Furthermore, the appellate court pointed out, the letter was dated April 18, while at the same time the letter indicated that Quake was to begin work the week of April 22 and complete the work by August 15. We agree with the appellate court's conclusion that a "reasonable inference from these facts is that the parties

intended that work on the Project would begin prior to execution of a formal contract and would be governed by the terms of the 'Letter of Intent.' " (181 Ill. App. 3d at 914.) All of these factors indicate the negotiations were more than merely preliminary and the parties intended the letter to be binding. The factors muddle whatever otherwise "clear" intent may be derived from the cancellation clause.

Defendants acknowledge the letter was dated April 18 and it stated the work would commence the week of April 22. Defendants point out that the letter also indicated Jones would submit a formal contract to Quake "shortly." Defendants argue a contract could conceivably have been written and signed within that period of time. Defendants conclude the appellate court's assumption regarding the date of the letter and the commencement of the work was invalid. While defendants' interpretation of these facts is plausible, we believe it only lends credence to our conclusion the letter is ambiguous concerning the parties' intent. Thus, the trier of fact should decide which interpretation is valid.

Both the dissent in the appellate court and the defendants contend, citing *S.N. Nielsen Co. v. National Heat & Power Co.* (1975), 32 Ill. App. 3d 941, a letter of intent may authorize a subcontractor to proceed with its work without waiving a condition precedent to an enforceable contract. In *S.N. Nielsen,* the appellate court upheld the circuit court's finding that a letter of intent from a general contractor to a subcontractor was not an enforceable contract. The letter authorized the subcontractor to proceed " '[s]ubject to approval of the Architects and Owner.' " (*S.N. Nielsen,* 32 Ill. App. 3d at 946.) The letter also stated a formal contract would be issued " 'in the very near future.' " (*S.N. Nielsen,* 32 Ill. App. 3d at 943.) The circuit court in *S.N. Nielsen* determined the parties did not intend to be bound until the

execution of a formal contract. (*S.N. Nielsen*, 32 Ill. App. 3d at 946.) The appellate court agreed. In addition, the appellate court in *S.N. Nielsen* held that the approval of the architects and the owner was also a condition precedent to the formation of a contract between the parties. (*S.N. Nielsen*, 32 Ill. App. 3d at 946.) Such approval was never obtained and no formal contract was entered into by the parties.

We find the facts in *S.N. Nielsen* distinguishable from those here. Nevertheless, the issue for resolution in *S.N. Nielsen* was: What was the parties' intent? The same issue exists in the case at bar. Thus, even if a letter of intent can authorize a subcontractor to begin the work without waiving a condition precedent in the contract, that is only one factor in determining the overall issue of intent. Here, we are merely holding the letter is ambiguous as to the parties' intent.

Defendants contend the appellate court majority's reliance on *Chicago Investment Corp. v. Dolins* (1981), 93 Ill. App. 3d 971, is misplaced. In *Dolins*, the issue was whether a certain document concerning the sale of several parcels of real estate was an enforceable contract. The document consisted of three typed pages which included some handwritten substitutions. (*Dolins*, 93 Ill. App. 3d at 972.) The handwritten caption of the document was "Letter of Intent." (*Dolins*, 93 Ill. App. 3d at 973.) The document listed the parties and their agents; a description of the parcels of real estate to be purchased; the purchase price for the entire sale, including a breakdown into the specific payment terms (*i.e.*, amount to be tendered at closing, and the interest rate of the mortgage); the amount of earnest money to be deposited; and the name of the escrow agent. (*Dolins*, 93 Ill. App. 3d at 973.) The document also contained a clause concerning the release prices for each of the properties, but the actual release prices were left blank. (*Dolins*, 93 Ill. App.

3d at 973.) The allocation of the total purchase price of the sale among all of the parcels was also left blank. *Dolins*, 93 Ill. App. 3d at 973.

The document stated that the parties " 'hereby express their understanding regarding the purchase and sale of['] five parcels of real estate." (*Dolins*, 93 Ill. App. 3d at 973.) The document also stated that the " 'final contract shall be in form and substance acceptable to attorneys for the Seller and Buyer.' " (*Dolins*, 93 Ill. App. 3d at 973.) Moreover, the document included a clause which stated: " 'Buyers will assume all executory contracts attached as a schedule in the contract.' " (*Dolins*, 93 Ill. App. 3d at 973.) No such schedule, however, was so attached. Another clause of the document stated that " '[i]mmediately upon execution of contract contemplated herein,' " the seller would take certain action concerning a business occupying space on one of the parcels. *Dolins*, 93 Ill. App. 3d at 973.

The circuit court in *Dolins* found that the document was not a contract and dismissed plaintiff's complaint seeking specific performance of the purported contract. The *Dolins* appellate court reversed that decision. The appellate court held the document was ambiguous and therefore the circuit court should have taken parol evidence before determining whether the parties intended to be bound by the document. (*Dolins*, 93 Ill. App. 3d at 975.) The *Dolins* appellate court stated that the document included a description of the properties for sale, the total price, the amount of the earnest money, the escrow agent, and the remaining terms of payment, as well as other terms. The appellate court indicated these terms revealed the parties' intent to be bound by the document. (*Dolins*, 93 Ill. App. 3d at 975.) On the other hand, the *Dolins* appellate court noted the document referred to " 'the final contract' " and the " 'execution of contract contemplated herein.' " (*Dolins*, 93 Ill. App. 3d

at 975.) The appellate court indicated these references in the document to a future formal contract, as well as the description of the document as a letter of intent, revealed the parties' intent not to be so bound. (*Dolins*, 93 Ill. App. 3d at 975.) The *Dolins* appellate court therefore found the document ambiguous.

Defendants contend *Dolins* is distinguishable from the case at bar. Defendants point out that the letter in the case at bar contained a cancellation clause which expressly stated that Jones could cancel the letter if the parties did not enter into a formal contract. Thus, the parties expressed an intent not to be bound until they executed a formal contract. In *Dolins*, defendants argue, the only indication in the document that the parties did not intend to be bound by the document was the caption denominating the document as a letter of intent.

We disagree with defendants' analysis of *Dolins*. The appellate court in the case at bar said the letter of intent contained detailed terms of the proposed agreement and this was partial evidence of the parties' intent to be bound by the letter. The appellate court cited *Dolins* for support of this conclusion because the court in *Dolins* referred to the detailed terms in the document before it as evidence of the parties' intent to be bound by the document. The letter in the case at bar, as well as the document in *Dolins*, also contained evidence indicating that the parties did not intend to be so bound; hence, the ambiguity in both cases.

Defendants further contend that the cancellation clause is not ambiguous. Defendants assert parties may agree, in a letter of intent, to the course of, and discontinuance of, their negotiations. Defendants argue the letter of intent in the case at bar merely reflects the parties' agreement regarding the course of their negotiations.

We, like the appellate court, find the cancellation clause itself ambiguous as to the parties' intent. We do not agree with defendants' assertion that the cancellation clause so clearly indicates the parties' intent not to be bound by the letter that the clause negates other evidence in the letter of the parties' intent to be bound. The clause can be construed as a condition precedent to the formation of a contract. The clause, however, also states that Jones can "cancel" the letter. As the appellate court noted, if the parties did not intend to be bound by the letter, they had no need to provide for its cancellation. We also agree with the appellate court that the cancellation clause "implies that the parties could be bound by the 'Letter of Intent' in the absence of a fully executed subcontract agreement." (181 Ill. App. 3d at 914.) Thus, the ambiguity within the cancellation clause itself enhances the other ambiguities in the letter.

The dissent stated the appellate court has repeatedly found language contained in the letter in the case at bar to be unambiguous. (181 Ill. App. 3d at 917 (McNamara, J., dissenting).) Defendants rely on these cases also. We have reviewed these cases and find them distinguishable. The courts in those cases did not merely look at a particular phrase or sentence in the letter of intent at issue; they examined the entire letter. Moreover, the language at issue in those cases is different from the language of the cancellation clause in the case at bar.

Defendants dispute the appellate court's reliance on *Inland*. The letter of intent at issue in *Inland* contained the following provision: " 'The *contracts* alone shall be the binding documents. (At which time this letter shall be null and void.)' " (Emphasis in original.) (*Inland*, 107 Ill. App. 3d at 185.) The circuit court in *Inland* dismissed plaintiff's complaint for specific performance, finding that the parties did not intend to be bound until the later execution of a formal contract. (*Inland*, 107 Ill.

App. 3d at 185.) The appellate court in *Inland*, however, held that an ambiguity existed regarding the parties' intent to be bound by the letter. (*Inland*, 107 Ill. App. 3d at 186.) The appellate court explained:

"The clause 'at which time this letter shall be null and void' evinces the intent to be then bound, for we fail to see the necessity for a provision nullifying or voiding a writing in the future if the parties never intended for that writing to be binding from its inception. In contrast, the clause 'the contracts alone shall be *** binding' evinces an intent not to be then bound. The juxtaposition of these conflicting statements clearly gives rise to a question of fact as to the parties' intent not properly resolved by a [motion to dismiss]." (*Inland*, 107 Ill. App. 3d at 186.)

The appellate court in *Inland*, therefore, held the circuit court erred in dismissing plaintiff's complaint.

Defendants claim the letter in *Inland* is more clearly a contract than the letter in the case at bar. Defendants contend the cancellation clause in the case at bar does not state that a contract is to be cancelled. Rather, the clause specifically refers to the cancellation of the letter of intent. According to defendants, no clause in the letter of intent in the case at bar states that the letter is immediately binding. Defendants argue that the letter in *Inland* indicated that it was a presently binding document until a formal contract was executed, and therefore the letter was not merely a letter of intent. The dissent in the appellate court in the case at bar made similar arguments.

We do not see the distinction defendants attempt to make between the case at bar and *Inland*. Instead, we find the similarities between the two cases striking. Both letters referred to future formal contracts which were to be the only binding documents between the parties. Both letters, however, also contained clauses which stated that

the letters could be voided or cancelled, thus indicating the parties' intent to be bound by the letters. Consequently, both letters were ambiguous as to the parties' intent concerning the binding effect of the letters. For these reasons, *Inland* supports the appellate court's holding in the case at bar.

Defendants allege that the appellate court's decision puts the continued viability of letters of intent at risk. Defendants contend if we uphold the appellate court's decision finding the cancellation clause ambiguous, negotiating parties will have difficulty finding limiting language which a court would unquestionably consider unambiguous. We disagree. Courts have found letters of intent unambiguous in several cases referred to in this opinion. (See *Interway*, 85 Ill. App. 3d 1094; *Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739.) Furthermore, contract cases each turn on their own particular set of facts. (*Borg-Warner*, 16 Ill. 2d at 242.) Thus, the existence or absence of particular language or words will not ensure that a letter of intent is unambiguous. Our decision here follows the settled law in Illinois concerning letters of intent: The intent of the parties is controlling.

Neither we nor the appellate court have decided whether in fact a contract exists, that is, whether the parties intended to be bound by the letter. We merely hold that the parties' intent, based on the letter alone, is ambiguous. Therefore, upon remand, the circuit court must allow the parties to present other evidence of their intent. The trier of fact should then determine, based on the evidence and the letter, whether the parties intended to be bound by the letter.

Defendants cite *Interway* and *Terracom* for support. The issue in *Interway* was whether a letter of intent executed by the parties was enforceable as a contract. The *Interway* appellate court affirmed the circuit court's dis-

missal of plaintiff's breach of contract complaint, holding that the letter was unambiguous and unenforceable. (*Interway*, 85 Ill. App. 3d at 1101.) The letter concerned the sale of assets of a certain corporation. It contained provisions regarding the total purchase price, bonuses, brokerage fees, warranties, insurance, noncompetition clauses and the discharge of a note. (*Interway*, 85 Ill. App. 3d at 1096.) The letter also included the following clause: " 'Our purchase is subject to a definitive Purchase and Sale Contract to be executed by the parties.' " *Interway*, 85 Ill. App. 3d at 1096.

Plaintiff argued that the letter was ambiguous because the words "subject to" were ambiguous. (*Interway*, 85 Ill. App. 3d at 1099.) Plaintiff also alleged that the letter was ambiguous because it contained inconsistencies. Plaintiff pointed out that even if the "subject to" clause clearly indicated the parties' intent not to be bound, the letter also contained the phrases " 'this will confirm our agreement' " and " 'we have agreed,' " thus indicating the parties' intent to be bound. (*Interway*, 85 Ill. App. 3d at 1100.) Plaintiff therefore concluded that because of these ambiguities the parties' intent should be subject to proof at a full trial. *Interway*, 85 Ill. App. 3d at 1099.

The *Interway* appellate court disagreed. The appellate court first found that the "subject to" clause unambiguously indicated the parties' intent not to be bound by the letter. (*Interway*, 85 Ill. App. 3d at 1099.) As to the alleged inconsistencies in the letter, the appellate court stated:

"We think that a review of the letter exhibits the tentative nature of any agreement between the parties. In addition to the express disclaimer that the purchase of [defendant's] business was 'subject to a definitive Purchase and Sale Contract,' the letter contains various provisions which indicate the inconclusive state of the nego-

tiations between the parties at the time the letter was signed. These provisions may more aptly be characterized as 'subject headings' than a description of binding obligations. The following provisions demonstrate this lack of specificity:

'(d) Usual warranties including financial warranties on June 30, 1978, financials and bring down warranties.

(e) Opinion of Counsel for Seller.

(f) Non-compete clause of seller and wife. Seller will not directly or indirectly assist his son to compete with TLC.'

It is obvious from the foregoing that questions concerning satisfactory warranties, discussions and/or disagreements involving the opinion of seller's counsel, and the extent, in both temporal and geographical terms, of the noncompetition clause, could arise and would require either clarification or additional agreements before the terms would have contractual finality. We also note that the letter requires [defendant] to bear the risk of loss until closing and additionally to 'cause any minority shareholders to transfer their shares.' This latter statement is not amplified, and there is no provision which explains the obligation, if any, in the event that [defendant] would be unable to secure the minority shareholders' compliance with the proposed sale. These provisions read in conjunction with the 'subject to' language clearly impart an incomplete state of agreement, and the letter on its face gives rise to no ambiguity. Contrary to [plaintiff's] contention, the clause, 'This will confirm our agreement,' when read in the context of the total letter, is not inconsistent because the parties had, in fact, preliminarily agreed to some aspects of the potential transaction. However, the clause in question does not establish that the process of negotiation had been completed." *Interway*, 85 Ill. App. 3d at 1100-01.

Defendants contend that, like the "subject to" clause in *Interway*, the cancellation clause in the case at bar is entirely clear and the letter of intent contains no ambiguity. We find *Interway* distinguishable. The "subject to"

clause in *Interway* is substantially different from the cancellation clause in the case at bar. As we have already stated, the cancellation clause used the term "cancel," thus creating an ambiguity. The clause in *Interway* did not contain any such ambiguity. In contrast to the agreement in the case at bar, many more terms of the agreement in *Interway* were left open. We also stress the work in the case at bar was to begin within days after the letter was written, thus indicating the parties' intent to be bound by the letter. No such similar circumstance existed in *Interway*.

In *Terracom*, plaintiff sued defendant for specific performance of an alleged contract between the parties concerning the sale of real estate. The appellate court in *Terracom* affirmed the circuit court's entry of judgment in favor of defendant at the close of plaintiff's case. During the parties' negotiations, several written offers and counteroffers were sent between them. On December 11, 1975, defendant sent a letter to the broker stating that defendant would accept the offer in plaintiff's letter of November 26, upon several conditions. (*Terracom*, 50 Ill. App. 3d at 741.) The December 11 letter set forth those various conditions and it also contained the following provision:

> " 'This letter of intent is not binding upon us in any way nor is the conditional offer contained herein binding upon us except to the extent that it reflects our intent to enter into a definitive written agreement with respect to the sale of the property described above upon the terms and conditions herein contained. This letter of intent is expressly conditioned upon our entering into a mutually satisfactory definitive written agreement in the form satisfactory to our counsel.
>
> Unless the definitive written agreement referred to above is duly executed in writing and signed by the parties on or before January 15, 1976, regardless of the reason for such agreement not having been so executed, neither

party shall be under any obligation to the other irrespective of this letter and irrespective of this letter [*sic*] and irrespective of any negotiations, agreements, or understandings heretofore or hereafter existing between the parties, it being understood that no contractual relationship shall exist between the parties unless and until the definitive agreement shall have been executed in writing.

If the foregoing is acceptable, please sign a copy of this letter enclosed for that purpose, return it to us, and we will instruct our counsel to prepare a draft of the definitive agreement for a review by your counsel and for discussion by both of us.' " (*Terracom*, 50 Ill. App. 3d at 741-42.)

The letter was signed by defendant, but not by plaintiff.

On December 12, plaintiff wrote defendant a letter accepting defendant's counterproposal in the December 11 letter subject to certain changes, such as a modification of the interest rate. (*Terracom*, 50 Ill. App. 3d at 742.) The December 12 letter was signed by plaintiff and, on December 15, was signed as "accepted" by defendant. *Terracom*, 50 Ill. App. 3d at 742.

The appellate court in *Terracom* determined that the contractual rights of the parties, if any existed, were governed by the letters of December 11 and 12. (*Terracom*, 50 Ill. App. 3d at 742.) The appellate court noted that the December 11 letter specifically stated that the letter was not binding on defendant. (*Terracom*, 50 Ill. App. 3d at 744.) The appellate court reiterated portions of the lengthy clause in the December 11 letter which stated that a formal agreement would be executed and that no contractual relationship existed between the parties until the parties entered into such an agreement. (*Terracom*, 50 Ill. App. 3d at 744.) The appellate court then held:

"[T]he language of the letters which passed between the parties is not ambiguous but is patently clear and definite. There should be no room for difference of opinion

in the conclusion that the only result apparent from this language is that neither party would be bound to the transaction until both had signed a formal and definitive contract.

\*\*\*

We note also the language in the letter from plaintiff dated November 26, 1975. The first paragraph spoke of having 'a standard form contract drawn up and executed.' The closing paragraph stated that in event the offer set out in the letter was acceptable, 'we will proceed to draw a formal contract.' This is virtually an affirmation of the same intent later expressed in defendant's letter of December 11, 1975, concerning the strong statement that neither party would be bound unless and until the definitive written agreement was executed.

In the case before us the trial court held that the agreement between these parties was unambiguous. \*\*\* We agree with the result reached." (*Terracom*, 50 Ill. App. 3d at 744-45.)

The *Terracom* appellate court concluded it was unnecessary and would have been legally improper for the circuit court to resort to parol evidence in determining the meaning of the parties' agreement. (*Terracom*, 50 Ill. App. 3d at 745.) The appellate court agreed with the circuit court that the unambiguous language in the letters revealed the parties' intent not to be bound until they entered into a formal contract. *Terracom*, 50 Ill. App. 3d at 745.

Defendants contend the cancellation clause in the case at bar is as clear as the clause in *Terracom*. We, however, find *Terracom* distinguishable from the case at bar. The extensive clause in the December 11 letter in *Terracom* was clearer and substantially different from the cancellation clause in the letter at issue here. Unlike the case at bar, plaintiff in *Terracom* accepted the terms of the December 11 letter by signing the December 12 letter. Moreover, the *Terracom* appellate court pointed out that plaintiff's earlier letter of November 26 re-

vealed plaintiff's intent not to be bound until the parties entered into a formal contract. Consequently, the intent of the parties in *Terracom,* based on their letters, was much clearer than the intent of the parties here.

· Defendants also cite *Evans, Inc. v. Tiffany & Co.* (N.D. Ill. 1976), 416 F. Supp. 224, and *Baltimore & Ohio Southwestern R.R. Co. v. People ex rel. Allen* (1902), 195 Ill. 423, for support. We find *Evans* and *Baltimore* distinguishable on their facts. In addition, we find the holdings and the law applied in *Evans* and *Baltimore* consistent with our decision here.

Thus, we hold that the letter of intent in the case at bar is ambiguous regarding the parties' intent to be bound by it. Therefore, on remand, the circuit court should allow the parties to present parol evidence regarding their intent. The trier of fact must then determine, based on the parties' intent, whether the letter of intent is a binding contract.

Plaintiff additionally argues that if the cancellation clause is a condition precedent to the formation of a contract, the parties nevertheless entered into a written contract when they agreed to the changes in the form contract. The appellate court did not address this issue. We do not need to address the issue either because this cause will be remanded to the circuit court for a determination of whether a condition precedent existed.

We must now decide how our holding affects each of the four counts in plaintiff's complaint. In count I, plaintiff alleged breach of contract. We have held that the circuit court should have taken parol evidence before it determined whether the letter constituted an enforceable contract. Thus, we agree with the appellate court that the circuit court improperly dismissed count I.

Plaintiff based count II on detrimental reliance, or in other words, promissory estoppel. To establish a claim based on promissory estoppel, plaintiff must allege and

prove that (1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment. (*Yardley v. Yardley* (1985), 137 Ill. App. 3d 747, 754; see *Bank of Marion v. Robert "Chick" Fritz, Inc.* (1974), 57 Ill. 2d 120, 124.) Plaintiff's reliance must be reasonable and justifiable. (*S.N. Nielsen*, 32 Ill. App. 3d at 944; *Vincent DiVito, Inc. v. Vollmar Clay Products Co.* (1989), 179 Ill. App. 3d 325, 328.) Plaintiff may recover on a theory of promissory estoppel despite the absence of a contract. *Bank of Marion*, 57 Ill. 2d at 124; *Huegel v. Sassaman* (1979), 75 Ill. App. 3d 414, 417.

The appellate court reversed the circuit court's dismissal of count II. The appellate court held that whether the parties intended to be bound by the letter was a question of fact which the circuit court should decide after hearing parol evidence. Therefore, according to the appellate court, the circuit court should not have determined, as a matter of law, that the letter was unenforceable due to an unfulfilled condition precedent, and that plaintiff's reliance on the letter was unjustified. 181 Ill. App. 3d at 915.

We agree with the appellate court. The determination of the parties' intent will affect the question of whether plaintiff met the elements of promissory estoppel, namely, whether plaintiff could have reasonably relied on the promise and whether defendants could have foreseen that plaintiff would so rely. We thus affirm the appellate court's reversal of the dismissal of count II.

Defendants contend Quake failed to allege all of the elements of promissory estoppel because Quake did not allege it relied on Jones' promise. The appellate court found that Quake sufficiently alleged the elements of promissory estoppel. (181 Ill. App. 3d at 915.) Quake alleged that Jones, both orally and through the letter of

intent, notified Quake that Jones had awarded the contract for the project to Quake. Quake also alleged that, upon Jones' express demand, Quake had expanded its office space, hired a project manager, secured subcontractors for the project and provided their license numbers to Jones, and prepared to perform the work required for the project. Quake alleged defendants knew Quake incurred great time and expense in performing these tasks. We agree with the appellate court that these allegations are sufficient to allege a cause of action under promissory estoppel.

In count III, plaintiff alleged defendants waived the condition precedent in the letter. Such waiver occurred, plaintiff alleged, when defendants advised plaintiff that the letter was an enforceable contract and performance of the work had to begin immediately. A party may waive a condition in a contract, including a condition precedent. (*Whalen v. K mart Corp.* (1988), 166 Ill. App. 3d 339, 343; *Swerdlow v. Mallin* (1985), 131 Ill. App. 3d 900, 904; *Grill v. Adams* (1984), 123 Ill. App. 3d 913, 917-18; *Morgan v. Meister* (1952), 346 Ill. App. 577 (abstract of opinion); *Chicago College of Osteopathic Medicine v. George A. Fuller Co.* (7th Cir. 1983), 719 F.2d 1335.) The circuit court dismissed count III and the appellate court reversed. The appellate court held dismissal of count III was premature in light of its holding the letter was ambiguous and that the circuit court must redetermine whether the letter contains a condition precedent. (181 Ill. App. 3d at 916.) We, likewise, find the circuit court's dismissal of count III premature and affirm the appellate court's decision.

The appellate court affirmed the circuit court's dismissal of count IV. The appellate court held the plaintiff failed to raise the issue of the circuit court's dismissal of count IV and, therefore, plaintiff waived the issue for purposes of appeal. (181 Ill. App. 3d at 911; 107 Ill. 2d

R. 341(e)(7).) Similarly, plaintiff does not raise any issue with regard to count IV before us. We thus affirm the appellate court's decision as to count IV.

For the foregoing reasons, we affirm the decision of the appellate court.

*Affirmed.*

JUSTICE STAMOS, specially concurring:

Because dismissal is unwarranted unless clearly no set of facts can be proved under the pleadings that will entitle a plaintiff to recover, I agree with the majority that the circuit court should not have dismissed counts I through III of Quake's complaint. I also agree with the majority that Quake has waived the issue of dismissing count IV. Thus, I concur in the judgment.

However, even though the Jones letter of intent is just ambiguous enough for Quake's complaint to survive a motion to dismiss, I consider that any interpretation of the letter's language as potentially establishing an underlying construction contract is far less plausible than the majority implies. It would be unfortunate if the court's affirmance and remand were construed as encouraging, on the basis of the letter's barely ambiguous text, any ultimate factual finding of intent to be bound to an underlying contract. Moreover, the misuse of letters of intent by parties seemingly wishing to have their contractual cake and eat it too, or wishing merely to fudge the contract issue, ought to evoke judicial disapproval. Therefore, I write separately.

Contrary to the majority's conclusion that "[t]he letter stated that Jones awarded the contract *** to Quake" (141 Ill. 2d at 293), the letter stated simply that Jones had "elected to award" the underlying construction contract to Quake "as we discussed on April 15" (141 Ill. 2d at 286). Though Quake separately alleged (141 Ill. 2d at 285) an earlier oral statement by Jones

that the contract had indeed been "awarded" to Quake, that allegation is not necessarily confirmed by the language of the letter.

Use of the word "elected," when combined both with the limiting reference to an earlier discussion of unspecified nature and with the other conditions set forth in the letter, may well be interpreted to mean simply that Jones had "decided" or "chosen" to award the construction contract to Quake—in much the same way as a homeseeker might decide to purchase a certain house he had toured, or a merchant to order products like those exhibited at a trade fair, or a homeowner to buy one brand of paint rather than others she had seen. In no such case is the mere act of decision, or election, equivalent to an actual offer or acceptance; neither of the latter occurs until the decision is translated into binding words or deeds. Before that occurs, the decision may need fortifying through further negotiation or investigation, and the prospective purchaser may ultimately decide against the transaction. See, *e.g.*, J. Calamari & J. Perillo, The Law of Contracts §2—6, at 35 (3d ed. 1987) (hereinafter Calamari & Perillo) (offers distinguished from statements of intention); 1 S. Williston, A Treatise on the Law of Contracts §§26 through 28 (Jaeger 3d ed. 1957) (hereinafter Williston) (offers distinguished from expressions of intention, preliminary negotiations, and agreements preliminary to written contracts).

The question here, then, is whether the written recital that Jones had "elected" to award the construction contract could itself be considered as actually binding Jones to such a contract. The matter is not as clear as the majority appears to believe. Some terms of the letter may tend to support existence of a construction contract; other terms cast doubt on it; but the "election" term is so ambiguous as to do neither.

. Moreover, the recital that work was to begin some 4 to 11 days after the date of the letter does not "reveal" an intent to be bound to a construction contract (141 Ill. 2d at 293-94), particularly since the letter's opening paragraph spoke of "shortly" preparing and tendering a "contract agreement." As defendants persuasively argue, it is quite possible to finish drafting and to present a formal contract in less time than four days. (*Cf.* Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum. L. Rev. 217, 252 & n.138 (1987) (hereinafter *Precontractual Liability*) (citing "stop-gap agreements" permitting contractors to begin work while parties negotiate construction contracts).) At most, this work-schedule language and the election language *hint* at an intent to be bound to a construction contract, but as evidence of such an intent I believe they are far less weighty than is the contrary evidence furnished by the letter's explicit and cautionary references to a forthcoming formal contract. Thus, I disagree with the majority's apparently evenhanded assessment of the evidence on this point, even though the trier of fact is correctly acknowledged to have the last word in the event that ambiguity in the letter's text prevents the court from ruling as a matter of law. 141 Ill. 2d at 297.

I am especially troubled by the majority's apparent view that, in regard to a construction contract, the letter's cancellation clause equally bespeaks an intent to be bound and an intent not to be bound. The parties are said to have had "no need to provide for its cancellation" if they did not intend to be bound by the letter, and the clause itself is said to imply that the parties could be bound by the letter if no "fully executed subcontract agreement" resulted. (141 Ill. 2d at 301.) This view of the cancellation clause seems to turn it on its

head and to pervert any legitimate office of letters of intent.

Instead of weighing as heavily for as against a construction contract, in my judgment the cancellation clause powerfully militates against any finding of such contract. The very language of the clause treats such a contract ("a fully executed subcontract agreement") as future possibility rather than present reality. Yet the majority would allow transmuting this prospective bargain into current obligation, by confusing a hoped-for construction contract with a cancellable preliminary expression of intent. Much as word is a shadow of deed, or wish may be father to thought (Democritus frag. 145; W. Shakespeare, Henry IV, Pt. II, act IV, sc. v, l. 91), a letter of intent may lead to a contract, but it is not necessarily the contract itself.

The cancellation clause refers expressly to cancelling the *letter*, not to cancelling the construction contract that the letter anticipates. A construction contract certainly would bind the parties to that contract's terms, but upon acceptance by Quake the letter here would much more plausibly be viewed as, at most, only binding the parties to efforts at achieving a construction contract on the terms outlined. See, *e.g., Evans, Inc. v. Tiffany & Co.* (N.D. Ill. 1976), 416 F. Supp. 224 (obligation to negotiate derived from unclear letter of intent); see also *Precontractual Liability*, 87 Colum. L. Rev. at 250-69 (discussing letters of intent classified as "agreements with open terms" and "agreements to negotiate"); Knapp, *Enforcing the Contract to Bargain*, 44 N.Y.U. L. Rev. 673 (1969) (discussing need for recognizing good-faith bargaining duty as intermediate stage between ultimate contract and none); *cf.* Shell, *Substituting Ethical Standards for Common Law Rules in Commercial Cases: An Emerging Statutory Trend*, 82 Nw. U.L. Rev.

1198, 1199 & n.7 (1988) (noting case law on duty of good-faith negotiation pursuant to letters of intent).

In formalistic contract parlance, there was mutual consideration for the letter. Consideration moving to Quake included (1) Jones' implied promise of efforts to negotiate and enter into an already partly defined construction contract with Quake and (2) Jones' conferral upon Quake of the ability to use the letter to obtain subcontractors' license numbers. Consideration moving to Jones included (1) Quake's own promise of efforts to contract with Jones and (2) Quake's additional promise of efforts to contract with subcontractors.

Hence, the letter itself, as distinguished. from the anticipated construction contract, may be regarded as a contract in its own right: a contract to engage in negotiations. If so, it was this contract, not the anticipated construction contract, that might be cancelled by Jones pursuant to the cancellation clause. Indeed, the notion of cancelling a construction contract not yet entered into lacks meaning.

Conceivably, the letter's arguable status as a contract to negotiate might be attacked on grounds that, because only Jones was given the right to cancel, the cancellation clause defeated mutuality of obligation. However, if such an attack succeeded, it would prove too much. It would mean not only that the letter had lost its character as a negotiation contract but also that any view of the letter as embodying the anticipated construction contract had become even more misguided. A telling point is that the majority's sympathy for reading the letter as establishing a construction contract fails to take account of this nonmutuality question.

It also may be possible to explain the letter of intent on an alternative theory of contract, but that tenuous theory does not support Quake's claim even if it can properly be applied in this setting. According to the theory, the let-

ter of intent would actually embody a construction contract, but one in which Quake gave its promise to perform on the condition that Jones should unconditionally promise to pay, and Jones gave its written and (for the time being) *conditional* promise to pay—Jones' condition or conditions to include (1) mutual agreement on a "fully executed" and superseding written contract instrument containing "detailed terms" and (2) perhaps some or all of the following: negotiation of door and tile modifications, liability insurance, performance and payment bond, achievement of goals for minorities' and women's employment and for city residency, and MBE certificates of commitment. (*Cf.* 1 A. Corbin, Corbin on Contracts §22, at 64-66 (1963) (hereinafter Corbin) (discussing written contract in which condition of third party's action was unwritten); *Precontractual Liability,* 87 Colum. L. Rev. at 245-49 (discussing enforceability of agreements containing promises arguably conditional on promisors' discretion to perform). But see 1 Corbin §30, at 107 (distinguishing between "condition" that further assent be manifested, hence "presumably" no contract, and condition of extraneous event or third party's act, hence plausibly irrevocable but conditional contract).) Then, upon failure of the condition for agreement on and execution of a detailed written contract, Jones would be discharged, just as Quake would be discharged on its conditional return promise, and any construction contract embodied in the letter of intent would itself fail. *Cf.* 1 Corbin §22, at 67 (discussing conditional contract and its failure upon breach of condition by one party).

Under this alternative theory, it would, of course, be relevant to consider whether the parties' conduct *after* issuance of the letter of intent—*e.g.*, their oral agreement to "certain changes in the written form contract" and their resulting interlineations (141 Ill. 2d at 287)—evidenced both their modification or waiver of Jones' exe-

cuted-contract condition and their agreement on definite terms of a superseding contract. Such a superseding contract might then have become effective immediately without signature despite the parties' intention to memorialize it in an integrated writing and sign it. (See Restatement of Contracts (Second) §27 (1981); 1 Corbin §30, at 109; §31, at 116-17; see generally 1 Corbin §§29, 30 (1963 & Supp. 1990).) If so, Quake might now recover for breach. However, such consideration of post-letter conduct would involve questions separate from interpretation of the letter of intent itself. Their resolution would not alter the *letter of intent's* status, under this alternative theory, as a conditional construction contract; nor would their resolution alter the fact that Quake would have no contractual claim should the parties fail to meet Jones' executed-contract condition (though a restitution or *quantum meruit* claim might be yet another question).

In any event, my conclusion today need not rely on this alternative and doubtful theory of conditional contract. The better view appears to be simply that the letter of intent can be considered an agreement to negotiate. On this view, because the cancellation clause referred to the letter and not to the anticipated construction contract, the majority errs in apparently considering the clause to be equally probative for and against the construction contract. Yet, one might ask in reply: If the letter required only an effort to achieve a construction contract, and if failure of the effort would necessarily prevent any such contract from arising to bind the parties, how could the issue of cancelling a mere letter ever take on enough significance to explain inclusion of the cancellation clause? For an answer, the nature, and misuse, of letters of intent should be considered.

"A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it

does not intend to conclude a bargain until he has made a further manifestation of assent." (Restatement (Second) of Contracts §26 (1981).) In this connection, it is well recognized that "the use of promissory expressions or words of assent" in nonoffer manifestations of willingness may constitute merely "something to be shown to a third person to influence his action." (Restatement (Second) of Contracts §26, comment *e* (1981); see Comment, *Devil's Advocate: Salvaging the Letter of Intent*, 37 Emory L.J. 139, 142 (1988).) This seems an apt description of the letter of intent in the present case, designed as it was in part to induce Quake's proposed subcontractors to furnish Quake and Jones with their license numbers.

If Quake had simply submitted a bid to Jones and if, after Jones had named Quake as subcontractor in Jones' own bid as general contractor, Quake had proceeded with the work pursuant to Jones' instructions, Quake might be able to establish a contract based on Jones' assent to Quake's bid as manifested by Jones' conduct, even if Jones contended that no contract with Quake existed. See *United States v. O. Frank Heinz Construction Co.* (S.D. Ill. 1969), 300 F. Supp. 396, cited in Restatement (Second) of Contracts §22, illus. 1 (1981); 1 Corbin §30, at 100-03 (1963 & Supp. 1990) (if terms are definite and complete enough, prime contractor's use of subcontractor's bid to secure prime contract may consummate subcontract even though not reduced to contemplated formal instrument) (citing, *inter alia, Frank Horton & Co. v. Cook Electric Co.* (7th Cir. 1966), 356 F.2d 485 (finding contract where prime contractor used subcontractor's bid to obtain prime contract, advised that subcontractor's bid would be accepted, issued two letters of intent regarding anticipated formal subcontract, asked subcontractor to start moving material to jobsites, but then rejected subcontractor's bid)). But see generally 1 Corbin §24B (Supp. 1990).

However, this is not such a simple case. In this case, the letter ·of intent contained language arguably giving Quake reason to know that Jones did not intend to be bound until other terms were assented to. (See Restatement (Second) of Contracts §27, comment *b* (1981); *cf. Borg-Warner Corp. v. Anchor Coupling Co.* (1958), 16 Ill. 2d 234, 238-39 (issuer of "letter of intent" assured recipient that it was offer and that open terms were minor details).) It also does not seem that Jones used Quake's bid in a bid by Jones to become general contractor; rather, Jones seems merely to have been American's prehired agent to review bids and award contracts to such parties as Quake. Moreover, though Quake alleges efforts to procure the contract and preparations to perform under it, Quake apparently proceeded with none of the actual work under its asserted construction contract.

It has been authoritatively said that, where a document contains limiting words signifying that a subsequent expression of assent is required, the limiting words "will in nearly all cases be held to show that an operative assent has not yet been given." (1 Corbin §22, at 64.) Parties may express an intent to be bound without a formal document, but they can also "maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction." (1 Corbin §30, at 98.) The matter is ordinarily a question of fact. Calamari & Perillo §2—8; 1 Corbin §30, at 97; see also Holmes, *The Freedom Not to Contract*, 60 Tul. L. Rev. 751 (1986) (arguing that freedom is limited by doctrines of reliance, fair dealing, and good faith but recognizing that issue of intent remains jurisprudentially paramount).

Businesspersons' letters of intent are "usually understood to be non-committal statements preliminary to a contract," but in some circumstances a commitment may have been made; in these fact-intensive cases the decisions have varied widely. (Calamari & Perillo §§2—6(c), (i); see *Precontractual Liability*, 87 Colum. L. Rev. at 258-62.) Because of

their susceptibility to unexpected interpretations, it is easy to understand why letters of intent have been characterized by at least one practitioner as "an invention of the devil." See Comment, *Devil's Advocate: Salvaging the Letter of Intent*, 37 Emory L.J. 139, 139 n.1 (1988) (citing characterization).

Vexed questions frequently arise in determining whether parties' use of language amounts to contract or only to preliminary negotiation. (See, *e.g.*, 1 Corbin §30; 1 Williston §§27 through 28A.) "It would be difficult to find a less predictable area of contract law." (*Precontractual Liability*, 87 Colum. L. Rev. at 259-60.) Accordingly, practitioners should take care not to allow the value of predictability in obligation to be outweighed by zeal for influencing third, or even second, parties through letters of intent.

In light of the foregoing, several hypotheses suggest themselves for explaining the present letter of intent's cancellation clause:

Because the letter can be regarded as creating an obligation on Jones to attempt to achieve a construction contract, existence of the clause might be explained as a device by which Jones could put an end to its obligation to negotiate.

The fact that this letter, like many others, was intended to induce action by third parties furnishes another possible explanation for including the cancellation clause: It would give Jones a way to put an end to any further inducement based on Jones' once-expressed intention.

A third possible explanation lies in the possibility that, as a result of the parties' subsequent conduct (such as commencement of construction work by Quake), an uncancelled letter of intent might become a link in a chain leading to a finding of contract.

Still another possible explanation lies in the fact that, commercially if not legally, letters of intent have a certain weight as trustworthy indicators of business decisions; accordingly, an issuer might wish to cancel a letter once a decision had changed, in order not to mislead those who might otherwise rely on it.

Any or all of these possibilities would adequately explain the clause, without any need whatever to conclude that the clause betokens an intent to be bound to a construction contract thought to be embodied in the letter. See also *Precontractual Liability*, 87 Colum. L. Rev. at 257-58 (discussing other possible rationales for clause).

If letters of intent are to be used, their drafters would be well advised to avoid ambiguity on the point of whether the issuers are bound. As ever, obscurantist language can produce desired practical effects in the short term, but can well lead eventually to litigation and undesired contractual obligations. Extreme examples exist. (See, *e.g.*, Note, *The $10.53 Billion Question—When Are the Parties Bound?: Pennzoil and the Use of Agreements in Principle in Mergers and Acquisitions*, 40 Vand. L. Rev. 1367 (1987).) Some counsel and clients may opt for ambiguity on grounds of expediency and may account for the probability of resultant litigation costs in the clients' overall business decision-making, but many others could benefit from more precision. In turn, counsel for recipients of such letters should remain alert to the likelihood that the instruments lack contractual force.

It is, of course, quite possible for litigation to ensue despite the utmost care in drafting. On occasion, pursuing even a slight opportunity for a favorable judicial construction will seem preferable to acquiescing in the opposing party's well-founded view of a letter's effect. However, more clarity than was displayed in this case should certainly reduce the number of such lawsuits.