**FIRST OPTIONS OF CHICAGO, INC.**

v.

**Carol KAPLAN.**

**Civil A. No. 94–5941.**

United States District Court,
E.D. Pennsylvania.

Jan. 16, 1996.

Walter M. Einhorn, Jr., Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, Stephen P. Bedell, Timothy G. McDermott, Gardner, Carton & Douglas, Chicago, IL, for Plaintiff.

Gary A. Rosen, Hangley, Connolly, Epstein, Chicco, Foxman, & Ewing, Philadelphia, PA, Gary A. Rosen, Connolly Epstein Chicco Foxman Engelmyer & Ewing, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

YOHN, District Judge.

This court is but one of many forums to host the parties' disputes, all of which ultimately date back to events resulting from the October 1987 stock market crash. First Options is suing Mrs. Kaplan for breach of a contract entered into by Mrs. Kaplan, her husband, Manuel Kaplan, and First Options in March of 1989. The terms of the contract encompassed the couple's 1987 tax refunds, the amount of which First Options claims it is due. Currently before the court are plaintiff's motion for summary judgment, defendant's cross-motion for summary judgment, and the responses thereto. The court will grant plaintiff's motion for summary judgment with respect to defendant's counterclaim. The remaining portions of plaintiff's motion and defendant's cross-motion for summary judgment will be denied.

### I. Background

First Options is a clearing firm and member of the Philadelphia Stock Exchange (the "Exchange"). First Options acted as the

clearing firm for MKI, an options market maker on the Exchange from 1984 through January 1989.[1] At all relevant times, Manuel Kaplan, Carol Kaplan's husband, was the president and sole shareholder of MKI. A Market Maker's Agreement, dated November 15, 1984, governed the relationship between MKI and First Options.[2] MKI maintained its trading accounts with First Options subject to this agreement.

The October 19, 1987 stock market crash created substantial losses in MKI's trading account. Five days before the crash, the MKI trading account had a net equity of $10.6 million. By the end of trading on October 19th, the account had fallen about $12 million dollars, to a deficit of $2 million.

First Options Market Maker's Agreement with MKI allowed it to liquidate MKI's positions "whenever in [First Options'] discretion [First Options] deem[ed] it necessary." (Letter Agreement, ¶ 4). Over the next two months, First Options took control of the MKI account and proceeded to liquidate those positions which it felt posed significant unacceptable risks. First Options' liquidation of MKI's positions increased MKI's deficit to about $5.1 million.

In the meantime, First Options and MKI had entered into settlement negotiations, with the intention to allow MKI to continue trading and recoup some of its losses for the benefit of First Options and MKI. The negotiations produced a "Workout Agreement." The Workout Agreement consisted of four documents: (1) a letter agreement executed by First Options, MKI, Mr. Kaplan, Mrs. Kaplan, and certain other entities and individuals (the "Letter Agreement"); (2) a guaranty executed only by MKI; (3) a subordinated loan agreement executed by First Options, MKI, and a separate entity; and (4) a subordinated promissory note executed by MKI.

Under the terms of the Workout Agreement, MKI agreed to repay a total of $6,227,188, the full amount of its trading deficits, including the deficit incurred when First Options took over its accounts. Pursuant to the Workout Agreement, MKI also immediately transferred four Exchange memberships to First Options; MKI and Mr. Kaplan contributed $900,000 to a new trading account, and MKI resumed trading in April 1988; Mr. Kaplan paid First Options $800,000; and Mr. and Mrs. Kaplan agreed to remit their 1987 tax refund to First Options upon receipt.[3] MKI also agreed to split its trading profits with First Options.

MKI resumed trading in April of 1988. In January 1989, however, before the parties fulfilled all obligations under the Workout Agreement, MKI suffered another setback

1. An "options market maker" trades options for its own account. A market maker's trading is facilitated by a "clearinghouse." The clearinghouse provides administrative support and risk control services and guarantees a market maker's account to other traders. A clearinghouse is compensated in part by commissions generated by the market maker.

2. The Market Maker's Agreement provided, in part:

[T]he undersigned shall at all times be liable for the payment upon demand of any debit balance or other obligations owing in any of the accounts of the undersigned with you and the undersigned shall be liable to you for any deficiency remaining in any such accounts in the event of the liquidations thereof, in whole or in part, by you or by the undersigned; and the undersigned shall make payments of such obligations and indebtedness upon demand.

(Market Maker's Agreement, ¶ 2).

3. The Letter Agreement provides, in part:

4. *Tax Refunds.* Mr. Kaplan and Mrs. Carol Kaplan . . . shall file (or cause to be filed) all necessary documents to obtain all tax refunds (including but not limited to, income tax refunds and estimated tax payments) which are now, or which may be or become, due or owing to Mr. Kaplan and/or Mrs. Kaplan from the United States Government or any state or local government. . . . Upon receipt of any and all tax refunds, Mr. Kaplan and Mrs. Kaplan agree to immediately remit the amount of such refunds to [First Options] which shall be applied by [First Options] to the prepayment of the Total Indebtedness.

(Letter Agreement, ¶ 4). The Letter Agreement further provides that "Mrs. Kaplan is signing this agreement to evidence her agreement to sign all documents necessary to fulfill the terms of this agreement applicable to her." (*Id.* ¶ 12). And, "Mr. Kaplan in his individual capacity does personally and unconditionally agree to fully and promptly perform at all times those aspects of this Agreement (such as *Sections 3 and 4*) which are specifically required by him to be performed. . . ." (*Id.* ¶ 13).

when the price of Texas Eastern Corporation ("TEC") stock rose dramatically as a result of a hostile takeover. Because at the time MKI held significant short-call positions on the TEC stock, it suffered heavy losses; MKI lost approximately $1.5 million the Monday morning following the takeover announcement. In response, First Options ordered Mr. Kaplan to reduce MKI's risk by adjusting its positions. Mr. Kaplan did not respond to the satisfaction of First Options, and, on January 17, First Options again took over the trading account of MKI. First Options this time barred MKI and Mr. Kaplan from the Exchange and ordered all MKI traders off the Exchange trading floor. First Options proceeded to liquidate MKI's positions; eventually $65,000 was added to the deficit that had been outstanding when the workout began. In addition, First Options demanded payment of the tax refund the Kaplans had agreed to remit to it, and contended that Mr. Kaplan was liable, as MKI's alter ego, for all the money MKI still owed First Options. MKI and the Kaplans refused First Options demands.

Since then, the parties have looked to a variety of adjudicatory bodies for vindication of their respective positions. First Options first submitted its claims to the arbitration process of the Exchange. In that forum, First Options brought claims against MKI for accelerated indebtedness under the Workout Agreement, claims against Mr. Kaplan as MKI's alter ego, and claims against Mr. and Mrs. Kaplan for the amount of their 1987 federal tax refund. Mr. Kaplan and MKI filed counterclaims against First Options for breach of contract, interference with prospective business opportunities, and libel and slander.

In May 1992, after eight days of hearings, the seven-member arbitration panel voted five to two in favor of First Options, entering an award for more than $5 million against MKI and Mr. Kaplan jointly and severally. The panel ordered Mr. and Mrs. Kaplan to remit their 1987 tax refund to First Options,

and also found for First Options on MKI and Mr. Kaplan's counterclaim.

MKI and the Kaplans filed a petition to vacate the award in federal district court; First Options filed a cross-petition seeking confirmation of the award. Another judge of this district confirmed the award. On appeal, the Third Circuit reversed the award in part, finding that the Exchange's arbitration panel had no jurisdiction over Mr. and Mrs. Kaplan. The Supreme Court agreed. *Kaplan v. First Options of Chicago*, 19 F.3d 1503 (3d Cir.1994), *aff'd*, —— U.S. ——, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

On February 2, 1993, while the parties contested the arbitration award, Mr. Kaplan filed for bankruptcy relief under Chapter 11 of the Bankruptcy Code; on November 23, 1993, the case was converted to Chapter 7. On August 31, 1994, First Options filed a proof of claim against Mr. Kaplan's bankruptcy estate for recovery of the Kaplans' $346,342 federal tax refund, based on the Letter Agreement in which Mr. Kaplan agreed to remit such refunds to First Options upon their receipt. On November 9, 1994, Mr. Kaplan instituted an adversary proceeding to challenge First Options' claim and to assert his own counterclaims against First Options. The bankruptcy court found in favor of First Options on the counterclaim, concluding that First Options did not breach any contractual obligation to MKI or Mr. Kaplan. *In re Kaplan*, 1995 WL 500599, at *6, 9 (Bankr.E.D.Pa. Aug. 22, 1995). The bankruptcy court also found that Mr. Kaplan had an "absolute" obligation to remit the tax refund to First Options, *id.* at *9 n. 7, and that Mr. Kaplan was individually "liable to First Options in the amount of the refund plus applicable interest." *Id.* at *11.[4]

While First Options pursued its remaining claim for the Kaplans' 1987 tax refund against Mr. Kaplan in the adversary proceeding, it filed this action against Mrs. Kaplan, raising the same claim and seeking the same damages. On November 15, 1995, First Options filed a motion for summary judgment as to both its claim against Mrs. Kaplan and

---

**4.** Mr. Kaplan has appealed the bankruptcy court decision, and it is currently pending in another court in this district.

Mrs. Kaplan's counterclaim against it. On December 5, 1995, Mrs. Kaplan responded to that motion, filing, in addition, her own cross-motion for summary judgment only with respect to First Options' claim against her.[5]

In support of its motion, First Options contends that the adversary proceeding in connection with Mrs. Kaplan's husband's bankruptcy action should have preclusive effects with regard to its breach of contract claim against Mrs. Kaplan and with regard to her breach of contract counterclaim against it. Namely, First Options contends that the bankruptcy court's determination that Mr. Kaplan had an "absolute" obligation under the Workout Agreement to remit the Kaplans' tax refund to First Options precludes Mrs. Kaplan from contesting First Options' claim that she breached her contract with First Options by failing to sign the Kaplans' 1987 tax refund check and failing to remit the check to First Options. Likewise, First Options contends that the bankruptcy court's determination that First Options did not breach any contractual duty to Mr. Kaplan precludes her counterclaim against First Options.[6] Mrs. Kaplan contests these claims and argues that certain provisions in the Letter Agreement negate the possibility of finding her individually liable for damages for breaching the Letter Agreement. The contentions will be discussed in turn.

## II. *The Legal Standard*

 Summary judgment is appropriate if the admissible evidence presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Sempier v. Johnson & Higgins*, 45 F.3d

5. This Court's scheduling order, entered July 18, 1995, provided that "[a]ll motions for summary judgment or partial summary judgment shall be filed and served on or before NOVEMBER 15, 1995." Mrs. Kaplan's cross-motion for summary judgment was not filed until December 5, 1995. In addition to being denied on the merits, her motion for summary judgment will be denied as untimely.

6. First Options also asserts that Mrs. Kaplan lacks standing to pursue her counterclaim against First Options. The Court will grant First Options' motion for summary judgment with regard to Mrs. Kaplan's counterclaim under the doctrine of claim preclusion, thus rendering consideration of the standing defense unnecessary.

724, 727 (3d Cir.1995) (citing *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.) (en banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987)). The moving party need not produce evidence to disprove the opponent's claim but does carry the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In turn, the non-moving party cannot rely on the allegations contained in the complaint. Instead, the nonmoving party must offer specific facts indicating that a genuine issue for trial exists. *Id.* at 324, 106 S.Ct. at 2553. If there are no genuine issues as to material facts, the court must determine whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *Claim Preclusion*

 First Option contends that the doctrine of res judicata or claim preclusion prevents Mrs. Kaplan from contesting either its claim against her or her counterclaim against it. Res judicata or claim preclusion works to prevent a party from raising or defending against a claim that has already been decided. Claim preclusion requires a showing that there has been "(1) a final judgment on the merits of a prior suit involving (2) the same claim and (3) the same parties or their privies." *Equal Employment Opportunity Comm. v. United States Steel Corp.*, 921 F.2d 489, 493 (3d Cir.1990) (citing *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir.1984)).[7] The parties focus on the last of these elements.

However, had First Options' claim preclusion arguments proven to be without merit, its standing argument would have succeeded. *See, e.g., English v. Powell*, 592 F.2d 727, 730 (4th Cir. 1979). Mrs. Kaplan cites no authority for the unique proposition that she can recover for her husband's loss of income.

7. The doctrine of claim preclusion applies to decisions made in bankruptcy proceedings. *Katchen v. Landy*, 382 U.S. 323, 334, 86 S.Ct. 467, 475, 15 L.Ed.2d 391 (1966); *FDIC v. Shearson–American Express, Inc.*, 996 F.2d 493, 497 (1st Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994); *Sure–Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d

■ The only parties in the adversary proceeding in bankruptcy court were First Options and Mr. Kaplan. However, claim preclusion may be used by or against "parties *or their privies.*" First Options contends that the relationship between Mr. and Mrs. Kaplan, and their joint relationship to the Workout Agreement and to the 1987 tax refund, renders them privies such that Mrs. Kaplan should be bound by the bankruptcy court's decisions. The claim and counterclaim require separate analysis and will be addressed in turn after review of the law of claim preclusion and privies.

■ The term privy "is merely a word used to say that the relationship between one who is a party on the record and another is close enough to include the other within the res judicata." *United States Steel Corp.,* 921 F.2d at 493 (citing *Bruszewski v. United States,* 181 F.2d 419, 423 (3d Cir.), *cert. denied,* 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950)); *Phillips v. Kidder, Peabody & Co.,* 750 F.Supp. 603, 607 (1990) ("[P]rivity is a legal determination for the trial court as to whether the relationship between the parties is sufficiently close to support preclusion.").[8] Courts have typically found privity to exist in three circumstances: (1) where the nonparty has succeeded to, or shares a concurrent right to the party's interest in, property, (2) where the nonparty controlled the prior liti-

869, 873 (2d Cir.1991); *In re Continental Airlines, Inc.,* 145 B.R. 404, 409 (D.Del.1992) ("The doctrine of res judicata applies with equal force to final judgments rendered by the bankruptcy courts and thus precludes relitigation in another bankruptcy proceeding and in other proceedings before federal and state courts.").

In addition, as previously noted, Mr. Kaplan has appealed the bankruptcy court decision, and it is currently pending in another court in this district. The finality of a judgment, and therefore its preclusive effect, however, is not affected by a pending appeal. *See, e.g., Rice v. Department of Treasury,* 998 F.2d 997, 999 (Fed.Cir. 1993); *In re Belmont Realty Corp.,* 11 F.3d 1092, 1095–96 (1st Cir.1993); *Ashford v. Skiles,* 837 F.Supp. 108, 115 (E.D.Pa.1993).

8. The Court of Appeals for the Third Circuit has not determined the appropriate law of preclusion—state or federal—that a federal court exercising its diversity jurisdiction should apply when considering the preclusive effect of a judgment rendered by another federal court which exercised diversity jurisdiction or decided a question of state law. *Lubrizol Corp. v. Exxon Corp.,* 929 F.2d 960, 962 & n. 2 (3d Cir.1991) (noting that the Third Circuit has not yet ruled on the issue); *but see Collins v. E.I. Dupont De Nemours & Co.,* 34 F.3d 172 (3d Cir.1994) (applying state preclusion law, without discussion, in a diversity case to determine the effect of a prior federal court decision).

In *Lubrizol,* however, the Third Circuit recognized, without approval or disapproval, that the majority of the courts of appeals have concluded that federal law on preclusion should apply in such circumstances. *Lubrizol,* 929 F.2d at 962 n. 2; *Petromanagement Corp. v. Acme–Thomas Joint Venture,* 835 F.2d 1329, 1333 (10th Cir. 1988); *Harnett v. Billman,* 800 F.2d 1308, 1312–13 (4th Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987); *Freeman v. Lester Coggins Trucking, Inc.,* 771 F.2d 860, 862 (5th Cir.1985); *Silcox v. United Trucking Serv., Inc.,* 687 F.2d 848, 852 (6th Cir.1982); *see also Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 42 n. 3

(2d Cir.1986) (dicta indicating approval of application of federal preclusion law), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); Charles A. Wright, *Law of Federal Courts* 695–96 (4th ed. 1983) (indicating that federal law of preclusion should be applied when a federal court is determining the preclusive effect of another federal court's ruling).

In addition, the *Lubrizol* opinion further noted that some courts look to state law to resolve substantive issues that may arise when applying federal res judicata or collateral estoppel principles; privity is frequently mentioned as one such substantive issue to which state law should apply. *Lubrizol,* 929 F.2d at 962 n. 2. Again, the court did not indicate its agreement or disagreement with such decisions.

Fortunately, the court need not resolve the issue now. State law requirements for res judicata and privity are not inconsistent with the federal law applied by this circuit. *See, e.g., Balent v. Wilkes–Barre,* —— Pa. ——, ——, 669 A.2d 309, 313 (1995) ("Res judicata ... bars a later action on all or part of the claim which was the subject of the first action. Any final valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies."); *Ammon v. McCloskey,* 440 Pa.Super. 251, 655 A.2d 549, 554 (1995) ("[P]rivity is defined as mutual or successive relationships to the same right of property, or such identification of interests of one person with another as to represent the same legal right." (quoting *Black's Law Dictionary* (5th ed. 1979)). Even if a Pennsylvania court would look to Illinois law to determine the effect of the bankruptcy court decision, *see supra* note 15, the result would be the same. *See Kinzer v. Chicago,* 128 Ill.2d 437, 132 Ill.Dec. 410, 414, 539 N.E.2d 1216, 1220 (1989) (listing Illinois principles of res judicata); *Schnitzer v. O'Connor,* 274 Ill. App.3d 314, 210 Ill.Dec. 630, 638, 653 N.E.2d 825, 833 (1995) ("identity of interests" determines privity for preclusion purposes).

gation, and (3) where the party adequately represented the nonparties' interests in the prior proceeding. *See, e.g., Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 983 (5th Cir.1990); 1B *Moore's Federal Practice* ¶ 0.411[1], at III–215.

First Options asserts that Mr. Kaplan was Mrs. Kaplan's "virtual representative" or that he adequately represented Mrs. Kaplan's interests such that the two are privies. The doctrine of virtual or adequate representation has been adopted by many courts. *Martin v. Wilks*, 490 U.S. 755, 761 n. 2, 109 S.Ct. 2180, 2184 n. 2, 104 L.Ed.2d 835 (1989) (a nonparty may be bound if his interests are "adequately represented by someone with the same interest who is a party"); *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir.1995) ("Res judicata may be asserted when the precluded party's interests have been adequately represented in a previous lawsuit."); *Matter of L & S Indus., Inc.*, 989 F.2d 929, 933 (7th Cir.1993) ("[A] person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative."); *In re Medomak Canning*, 922 F.2d 895, 901 (1st Cir.1990) ("[P]rivity may be established by identification of interests, even where representation of those interests is not authorized.")

The Third Circuit has not addressed the issue of virtual representation in the context here presented. General principles of the doctrine, as adopted by this Circuit, however, suggest that Mrs. Kaplan is a privy of Mr. Kaplan with respect to the breach of contract counterclaim she asserts against First Op-

tions, and that she should thus be barred from litigating that claim.

The Third Circuit has long recognized that privity is a legal conclusion; the privity inquiry should be flexible enough to acknowledge the realities of parties' relationships. *Bruszewski*, 181 F.2d at 423 (noting that the test for privity is whether there is a sufficiently close relationship between the party to the prior litigation and the nonparty against whom the prior judgment is being used). More recently, in *Moldovan v. Great Atlantic & Pacific Tea Co.*, 790 F.2d 894 (3d Cir.1986), *cert. denied*, 485 U.S 904, 108 S.Ct. 1074, 99 L.Ed.2d 233 (1988), a panel was asked to determine whether an arbitration ruling to which a union was a party should have preclusive effect in an action to which pension fund trustees were a party. The opinion noted that the "party against whom the collateral estoppel has been asserted [must] have some fair relationship with the prior litigation relied upon." *Moldovan*, 790 F.2d at 899.[9] The *Moldovan* opinion indicates that courts should focus on the "relationship" between the parties and determine "whether there is such an *identity of interests* between the first and second party that the second should ever be deemed in privity with the first." *Id.* (emphasis added). In the context of the labor union and trustees for the pension fund, the court determined that whether privity existed depended on the nature of the union's obligation to represent the interests of the trustees. *Id.* ("Whether the trustees had such a relationship with the prior litigation that its outcome can be held binding upon them depends upon what obligation Local 590 had to safeguard their interests.").[10]

**9.** *Moldovan* involved collateral estoppel, but discussed privity, a concept which is common to both preclusion doctrines, collateral estoppel (issue preclusion) and res judicata (claim preclusion).

**10.** Mrs. Kaplan argues that *Moldovan* suggests that virtual representation would apply "only where the prior party was legally obligated" to represent the interests of the nonparty's interests. (Def.'s Mem.Opp.Mot.Summ.J., at 7). Indeed, some courts have agreed with this interpretation. *See Antrim Mining, Inc. v. Davis*, 775 F.Supp. 165, 169 (M.D.Pa.1991) ("The Third Circuit Court of Appeals has held that for the doctrine

[of virtual representation] to apply the party in the first suit must have had some obligation to safeguard the interests of the party in the second suit." (citing *Moldovan* )); *see also Collins*, 34 F.3d at 178 (Third Circuit applying New Jersey law).

The *Moldovan* opinion, while mentioning the nature of the obligation to represent the nonparty's interests, more strongly suggests that the focus should be on the identity of interests between the parties. The relationship between the parties and between the nonparty and the prior litigation, and the nature of the respective interests involved are all factors to consider in the privity analysis. In *Moldovan*, the trustees were

Other cases, involving facts more similar to those presented her, have discussed the spousal relationship and how it affects the preclusion and privity inquiries. For example, in *Eubanks v. FDIC*, 977 F.2d 166 (5th Cir.1992), Dr. Eubanks filed for bankruptcy, and his plan was confirmed by the bankruptcy court. Dr. and Mrs. Eubanks subsequently filed suit against two banks, both of which were Dr. Eubanks' creditors, alleging that the creditor-banks violated a state statute and breached fiduciary duties toward Dr. Eubanks, committed fraud, and breached a loan contract. The bank-creditors argued, and the court agreed, that the Eubanks' should have brought the claims in bankruptcy court, and that failure to so precluded them from subsequently raising the claims. In finding that Mrs. Eubanks, who did not participate in the bankruptcy proceedings, was precluded from raising the claims, the court noted:

> It is well-settled that, under certain circumstances, a judgment may bar a subsequent action by a person who was not party to the original litigation.... For example, where the non-party's interests were adequately represented by a party to the prior action, we have concluded that there is sufficient identity between the parties to apply the principles of res judicata and give preclusive effect to the prior judgment.... A non-party, such as Mrs. Eubanks, is adequately represented where a party to the prior suit is so closely aligned to her interest as to be her virtual representative.... this requires more than a showing of parallel interests—it is not enough that the non-party may be interested in the same questions or proving the same facts.

*Eubanks*, 977 F.2d at 170. The court decided that the bank-creditors showed that Dr. and Mrs. Eubanks shared *more* than parallel interests:

> [T]he interests at stake could not be more closely aligned. Mrs. Eubanks purchased no interest in the partnership, and she had no legal relationship with either of the banks. The claims she asserts derive exclusively from claims asserted by her husband.... [T]here was sufficient identity of parties to apply principles of res judicata.

*Id.* at 170.[11]

Likewise, in *Seamon v. Bell Telephone Co.*, 576 F.Supp. 1458 (W.D.Pa.1983), *aff'd*, 740 F.2d 958 (3d Cir.1984), the district court held that a husband was in privity with his wife for purposes of his loss of consortium and intentional infliction of emotional distress claims against his wife's employer. For purposes of res judicata, his wife's earlier Title

---

not present or in any way involved in the prior litigation, the trustees had some important interests that diverged from those of the union, the trustees and the union were not related for purposes of the litigated claim, and the union had no legal obligation or accountability to the trustees. Together, these factors worked against a finding of privity and did not preclude the trustees from litigating the issue already decided against the union. In another case, a different combination of the factors—particularly one including identity of interests—could lead to preclusion.

11. Some courts have indicated that in addition to parallel interests, the party to the prior litigation must be accountable to the nonparty before virtual representation will exist. *See, e.g., Becherer v. Merrill Lynch Pierce Fenner & Smith*, 43 F.3d 1054, 1070 (6th Cir.) ("Virtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues....") (quoting *Benson and Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1195 (5th Cir.1987)), *cert. denied*, ___ U.S. ___, 116 S.Ct. 296, 133 L.Ed.2d 203 (1995); *Klugh v. United States*, 818 F.2d 294, 300–01 (4th Cir.1987) ("[P]arties to the first suit must be accountable to the nonparties who file a subsequent suit."); *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 640 (2d Cir.) (indicating that the interests of the nonparty must be adequately represented by another vested with the authority of representation), *cert. denied*, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987); *see also supra* note 10. *But see In re Medomak Canning*, 922 F.2d at 901 (explicitly finding virtual representation even where the representation was not authorized). Rather than requiring the legal obligation or accountability in all circumstances, however, the cases are better read as indicating that such a relationship is but one factor that will push mere sharing of parallel interests, into privity for res judicata or collateral estoppel purposes. 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* ¶ 4457 (noting that all of the cases finding virtual representation have involved several factors including adequate litigation by a party holding parallel interests).

VII case against her employer worked to preclude the husband's claims. The court noted that:

A person is in privity when a close or significant relationship exists between the parties.... Privity has been found where a spousal relationship exists.... the plaintiffs here are married. The husband's claims are closely aligned with those of his wife, arising from the same factual allegations and dependent at least in part on proof of injury to her.... It is clear then that Michael was in a close relationship with Eileen, his claims are closely aligned with hers, and he was involved to some extent or at least aware of the claims presented in the original action.

*Id.* at 1461.

■ Case law reveals that the primary concern of the adequate representation doctrine is alignment of the interests and incentives of the party to the prior litigation and the nonparty against whom res judicata is claimed. The claims of both First Options and Mrs. Kaplan must be analyzed with this concern at the fore. First, with regard to First Options' breach of contract claim against Mrs. Kaplan, Mr. and Mrs. Kaplan do not have identical interests; she was not adequately represented through Mr. Kaplan's efforts before the bankruptcy court. Several provisions in the Workout Agreement refer only to Mrs. Kaplan; others only to Mr. Kaplan. For example, the Letter Agreement contains a clause stating that Mrs. Kaplan signed the Agreement "to evidence her agreement to sign all documents necessary to fulfill the terms of this agreement applicable to her." (Letter Agreement, ¶ 12) No similar clause references Mr. Kaplan. Another provision of the Letter Agreement states that "Mr. Kaplan in his individual capacity does personally and unconditionally agree to fully and promptly perform at all times those aspects of this agreement (such as sections 3 and 4) which are specifically required by him to be per-

formed and which are within his control." (*Id.* ¶ 13) [12] Mr. Kaplan's arguments in the adversary proceeding reflected only those provisions relating to him. As such, Mr. Kaplan did not adequately represent the interests of Mrs. Kaplan in the bankruptcy proceeding with regard to First Options breach of contract claim for the amount of the Kaplans' 1987 tax refund. As to that claim, then, Mr. and Mrs. Kaplan are not privies, and Mrs. Kaplan is not barred from contesting First Options claims against her.

Second, with regard to the counterclaim raised by Mrs. Kaplan, the *Eubanks* and *Seamon* cases prove more instructive. Here, unlike the situation in either *Eubanks* or *Seamon*, Mrs. Kaplan does have a legal relationship with First Options; she signed the Letter Agreement, and, as such, the two share a contractual relationship. Like the two cases, however, Mrs. Kaplan's claim against First Options derives from the claims asserted by her husband. Although Mrs. Kaplan argues that First Options breached its contract with her, the substance of that breach is that First Options breached its contract with her husband. Mrs. Kaplan's claim is, essentially, that First Options breached its contract with her by breaching its contract with Mr. Kaplan. Indeed, in her answer and counterclaim to First Options complaint, Mrs. Kaplan admits as much:

In the event it is determined that First Options had a binding and enforceable contract with Mrs. Kaplan, supported by valuable consideration, which is specifically denied, then First Options' obligations under the Workout Agreement to Mr. Kaplan inured to the benefit of Mrs. Kaplan, who has been damaged by First Options' breach of those obligations.

(Def.'s Ans. & Counterclaim, ¶ 34). After a two day trial, replete with "voluminous documentary exhibits," several witnesses, and heavy briefing, the bankruptcy court determined precisely this claim, finding that "[First Options] did not breach any express

---

**12.** The bankruptcy court's decision did not discuss those provisions relating to Mrs. Kaplan and, in fact, placed some emphasis on those applying only to Mr. Kaplan. The bankruptcy court considered the guaranty significant in determining Mr. Kaplan personally liable for the amount of the tax refund. *In re Kaplan,* 1995 WL 500599, at *10–11 (citing the provision and noting that the "Debtor cannot guarantee the payment of the Refund and then argue that it was never his intention to be personally liable for such payment").

term of either the Workout Agreement or the Account Agreements." *In re Kaplan,* 1995 WL 500599, at *5.

Like *Eubanks* and *Seamon,* there can be no doubt that Mr. and Mrs. Kaplan's interests are closely aligned (so closely as to be identical), that they have aligned incentives to pursue the breach of contract claim against First Options, and that Mrs. Kaplan's claims derive from obligations owed, in the first instance, to Mr. Kaplan.

In addition, other factors indicate that Mrs. Kaplan's interests were virtually represented, with respect to the counterclaim, in the bankruptcy proceeding. Mr. and Mrs. Kaplan are husband and wife; they share a significant, close nonlitigation relationship. Mr. and Mrs. Kaplan filed a joint tax return, and they have a mutual right to and interest in the joint tax refund in dispute. The same attorney represents Mrs. Kaplan in the action before this court as represented her husband in the bankruptcy proceeding. The pleadings with respect to the counterclaim mirror those Mr. Kaplan filed in the adversary proceeding, save for differences reflecting the forum, the procedural posture under which the claim was brought, and the names of the parties. Mrs. Kaplan claims the exact injury and seeks the same damages as did Mr. Kaplan. Mrs. Kaplan does not suggest that she will pursue any arguments or present any facts different than those presented by Mr. Kaplan to the bankruptcy court. Alone, each one of these factors would likely not support a finding of privity and a conse-

quent application of res judicata against Mrs. Kaplan. *See* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* ¶ 4457 (noting that all of the cases that preclude litigation by a nonparty have involved several factors, including a family or other close relationship, participation in the prior litigation, or acquiescence in the representation, in addition to adequate representation by a party with parallel interests). Together, however, these considerations indicate that Mr. and Mrs. Kaplan are privies with respect to the breach of contract claim asserted against First Options. The prior bankruptcy court judgment against her privy, Mr. Kaplan, precludes Mrs. Kaplan from raising her claim against First Options.[13]

 Finally, Mrs. Kaplan's motion for summary judgment against First Options can be denied with little discussion. Mrs. Kaplan points to the provisions of the Letter Agreement which refer to her alone and asserts that they relieve her of any individual liability for failing to remit to First Options an amount equal to her and her husband's 1987 tax refund. In particular, Mrs. Kaplan cites paragraph twelve of the Letter Agreement which states, in part: "Mrs. Kaplan is signing this agreement to evidence her agreement to sign all documents necessary to fulfill the terms of this agreement applicable to her." Mrs. Kaplan argues that this provisions shows that she was only agreeing to endorse any joint tax refund check, not to be

---

13. Although not directly raised by First Options, under the doctrine of issue preclusion Mrs. Kaplan appears to be precluded from raising certain defenses to its breach of contract claim against her. "Issue preclusion may be invoked when (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party to or in privity with a party to the prior litigation; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question." *Board of Trustees of Trucking Employees v. Centra,* 983 F.2d 495, 505 (3d Cir.1992); *see also Balent,* 669 A.2d at 313, (Pennsylvania version of issue preclusion); *In re Nau,* 153 Ill.2d 406, 180 Ill.Dec. 240, 249, 607 N.E.2d 134, 143 (1992) (Illinois version of issue preclusion).

In accordance with the court's claim preclusion analysis, for purposes of defending the

breach of contract claim against her with the assertion that First Options materially breached its contract with the Kaplans, Mrs. Kaplan is likely in privity with her husband. The bankruptcy court has settled that issue in First Options' favor. Likewise, the issue of contract construction presented by Mrs. Kaplan—that First Options' sole remedy if it did not receive the 1987 tax refund was acceleration of MKI's debt—was resolved by the bankruptcy court also in First Options' favor. *In re Kaplan,* 1995 WL 500599, at *9–11. Mr. and Mrs. Kaplan share the same interests and are likely in privity with respect to that defense as well. The only completely new issue presented by Mrs. Kaplan involves the contract language that allegedly limits her obligation to First Options. However, because the parties have not briefed the matter of issue preclusion, the court will not make a final determination until trial.

personally liable for not remitting an amount equal to the refund to First Options.[14] Mrs. Kaplan notes also that only Mr. Kaplan signed a personal guaranty, and paragraph thirteen of the Letter Agreement reflects only Mr. Kaplan's personal guaranty. Mrs. Kaplan, however, ignores paragraph four which states: "Upon receipt of any tax refunds, Mr. and Mrs. Kaplan agree to immediately remit the amount of such refunds to [First Options]."

The contract does not unambiguously establish the extent of Mrs. Kaplan's obligations to First Options, or whether she was not to be held personally liable for any breach of the Letter Agreement. That question is a matter of fact involving the intentions of the parties and extrinsic evidence; it cannot be resolved on a motion for summary judgment. *See, e.g., Quake Constr., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 312, 565 N.E.2d 990, 994 (1990).[15]

## IV. *Conclusion*

First Options claims that Mr. and Mrs. Kaplan breached their contract with First options by failing to remit to it an amount equal to their 1987 tax refund. First Options raised its claim against Mr. Kaplan in an adversary proceeding in bankruptcy court. In that proceeding Mr. Kaplan defended his failure to remit an amount equal to the couple's 1987 tax refund on the grounds that, *inter alia,* First Options breached the contract between it and the Kaplans. Mr. Kaplan also raised his own counterclaim against First Options on these grounds. After a two day trial, the bankruptcy court found for First Options on all of the claims. Because Mr. and Mrs. Kaplan share identical interests with regard to the breach of contract claim against First Options, have a significant and close nonlitigation relationship, present the same pleadings, offer the same evidence and legal theories, and are repre-

sented by the same attorney, they are privies with respect to this claim and Mrs. Kaplan is precluded from maintaining her counterclaim against First Options. Because, however, Mrs. Kaplan's position with respect to a defense to First Options breach of contract claim against her is different than that of her husband by virtue of several clauses in the contract, the two are not in privity with respect to First Options claims. Therefore, Mrs. Kaplan is not barred from defending against that claim. First Options motion for summary judgment is thus granted in part and denied in part.

Mrs. Kaplan claims that she did not agree to be individually liable for failure to remit an amount equal to the Kaplans' 1987 tax refund. She supports this contention by reference to various portions of the Letter Agreement. Because the provisions do not unambiguously point to such a conclusion, Mrs. Kaplan's motion for summary judgment is denied.

An appropriate order has been filed.

---

14. Mrs. Kaplan testified during her deposition that she "insisted there be some kind of a clause stating that I was not—that I was only signing—they wanted me to sign because we filed taxes jointly, and I signed the agreement stating that I would sign the income tax check." (Kaplan Dep., at p. 34).

15. Illinois law applies to contract construction because the parties so indicated in the Letter Agreement's choice-of-law clause. (Letter Agreement, ¶ 16)