**Arvid M. BAKKE, Plaintiff,**

v.

**COTTER & COMPANY, an Illinois Corporation, Defendant.**

**No. 96 C 3027.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 12, 1997.

---

Abraham Brustein, Thomas Justin Cunningham, Kristin Marie Davis, Smith, Williams & Lodge, Chicago, IL, for Plaintiff.

Diane T. Nauer, Cotter & Co., Chicago, IL, for Defendant.

***MEMORANDUM OPINION AND ORDER***

BUCKLO, District Judge.

The plaintiff, Arvid M. Bakke, sued his former employer, Cotter & Company ("Cotter") under federal and state law. Cotter moved for summary judgment. For the following reasons, the motion is denied. ·

**I.[1]**

In 1988, Mr. Bakke was hired as an Engineer by a division of Cotter, Baltimore Brush and Roller ("BB & R"), which manufactured

---

1. The following facts are undisputed. Cotter objects to the form and substance of Mr. Cotter's 12(N) Statement on several grounds and asks me to strike numerous paragraphs. Contrary to the defendant's argument, Mr. Bakke's 12(N) Statement is supported by accurate citations to the record and the plaintiff's affidavit does not contradict his deposition. *See Curde v. Xytel Corp.,* 912 F.Supp. 335, 339 (N.D.Ill.1995). However, Mr. Bakke does not comply with N.D. Local R. 12(N)(3) fully. In most instances, the plaintiff goes beyond controversion and provides additional facts; the place for additional facts is a separate statement. N.D. Local R. 12(N)(3)(b). Mr. Bakke's additional facts are not broken down into short paragraphs, N.D. Local R. 12(N), but occupy multiple pages. Nevertheless, I was able to determine which of Cotter's facts Mr. Bakke admits and which he denies. *See Curde,* 912 F.Supp. at 338–39. I was also able to follow the plaintiff's factual presentation. Therefore, Cotter's request to strike is denied.

brushes and rollers. (12(M) Statement ¶ 5.) Prior to joining BB & R, Mr. Bakke worked as an Engineer for approximately seven years for EZ–Paintr. (*Id.* ¶ 6.) A recruiter contacted Mr. Bakke to determine whether he was interested in alternative employment with Cotter. (*Id.* ¶ 7.) Richard Moniz, BB & R's General Manager, interviewed and made the offer to Mr. Bakke. (*Id.* ¶¶ 9–13.)

In 1994, BB & R decided to automate its paint brush manufacturing process. (*Id.* ¶ 17.) Mr. Moniz decided to develop an automation system in-house by "tying together" existing and newly purchased equipment. (*Id.* ¶¶ 19, 21.) Mr. Bakke was assigned to work on this project ("paint brush manufacturing automation project").

Tru-test division ("True Test") of Cotter manufactures paints and related products, such as brushes and rollers. (*Id.* ¶ 1.) In 1995, Tru–Test absorbed BB & R. (*Id.* ¶ 3.) David Bigelow, the Manufacturing Manager of Tru–Test, discontinued the paint brush manufacturing automation project in which Mr. Bakke was engaged. (*Id.* ¶ 26.) He also recommended that Cotter purchase the Polese,[2] which automates the paint brush manufacturing process. On June 30, 1995, at age 54, Mr. Bakke was discharged. (*Id.* ¶ 4.)

Mr. Bakke filed suit against Cotter charging age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and breach of contract and promissory estoppel under Illinois law. Cotter moves for summary judgment.[3]

## II.

### Age Discrimination in Employment Act (ADEA)

#### Prima Facie case [4]

■ When a case involves an employer's reduction-in-force (RIF),[5] an ADEA plaintiff makes out his prima facie case by showing that (1) he was in the protected age group,[6] (2) he was performing to his employer's satisfaction, (3) he was discharged, and (4) younger employees were treated more favorably.[7] *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir.1995).

■ There is no dispute that Mr. Bakke meets the first three elements of the prima facie case. At the time of his discharge, Mr. Bakke was 54 years old and, therefore, in the protected age group. Cotter concedes that the plaintiff performed his duties satisfactorily. The parties dispute whether Mr. Bakke has shown that Cotter treated younger employees more favorably.

■ Mr. Bakke argues that the defendant treated younger employees more favorably because, although it eliminated Mr. Bakke's position, Cotter assigned all of the plaintiff's former duties to younger employees, Leo Geib (age 32), George Krueger (age 43), and Richard Cygan (age 49). Cotter responds that Messrs. Geib, Krueger, and Cygan were not similarly situated to Mr. Bakke because they occupied different positions. I agree that, in order to raise an inference of discrimination, the younger employees whom the defendant does not fire in

---

**2.** Cotter uses the term "the Polese system," while Mr. Bakke insists that the Polese is merely a "machine." To avoid this semantic warfare, I will refer to "the Polese."

**3.** The standard for summary judgment is well known and will not be repeated here.

**4.** Not in possession of any direct evidence of age discrimination, Mr. Bakke chooses to proceed under the burden-shifting *McDonnell Douglas* framework. *Lewis v. Aerospace Community Credit Union*, 114 F.3d 745, 748 (8th Cir.1997).

**5.** The parties agree that Mr. Bakke was discharged as a result of a RIF. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990) ("work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company"); *see also Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1332 (7th Cir.1995) ("where only one employee is discharged and his responsibilities are absorbed by other employees[,] ... a mini-RIF" occurs).

**6.** The protected class includes employees "at least 40 years of age." 29 U.S.C. § 631(a).

**7.** This formulation of the fourth prima facie case element conforms with the Supreme Court's holding that the employees treated more favorably need not be outside the protected class. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

the course of a RIF must be similarly situated to the plaintiff. *Gadsby*, 71 F.3d at 1332 (in RIF, "inference of discrimination comes from the belief that employer selected the plaintiff for termination ... from a group of employees who were equally qualified for termination"); *Roper v. Peabody Coal Co.*, 47 F.3d 925, 927–28 (7th Cir.1995) (prima facie case not made out where plaintiff pointed to younger "employees who [were] not easily comparable to [him]") However,

> [i]n an RIF case, the inference of discrimination raised by the more favorable treatment of younger employees (typically the act of not firing them) is premised on some degree of fungibility between the plaintiff's job and the younger employee's job.... [T]he fungibility of jobs is implicit when the terminated employee's responsibilities are absorbed by other employees. The inference of discrimination comes from the belief that the employer selected the plaintiff for termination based on age from a group of employees who were equally qualified for termination based on criteria other than age.

*Gadsby*, 71 F.3d at 1331. "Although redistribution of a discharged employee's duties to younger employees is insufficient by itself to establish a prima facie case of age discrimination[,] ... specific circumstances of [a] case [may] raise some suspicion as to [the defendant's] motives in implementing its reduction in force." *Lewis*, 114 F.3d at 748. So that if an employer claims that the position was eliminated because it was no longer necessary, as Cotter does here, yet effectively preserves it by assigning the plaintiff's former duties to the remaining younger employees, an inference of discrimination is raised. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir.1997) (employer cannot "get around ... *McDonnell Douglas* formula[ ] by fractionating an employee's job"); *Collier*, 66 F.3d at 890 (prima facie case is flexible standard and fourth prong varies depending on circumstances). If Mr. Bakke's job was, indeed, divided among Messrs. Geib, Krueger, and Cygan, the latter individuals can be deemed to be "similarly situated" for the purposes of the prima facie case.

## Mr. Bakke's Position Prior to His Discharge

In order to determine whether Mr. Bakke's duties were absorbed by the remaining employees, it is necessary to identify what Mr. Bakke's position entailed.

Cotter says that Mr. Bakke was an Engineering Manager, "primarily responsible for developing in-house machinery systems, either to automate existing functions or provide functions not yet available at BB & R," which involved (1) developing detailed sketches of machinery, (2) bringing pieces or sections of machinery together, and (3) modifying machinery. (12(M) Statement ¶¶ 5, 15, 16.) Mr. Bakke admits that he modified machinery. (12(N) Statement ¶ 29 at 23.) He insists, however, that, with a few exceptions, his duties did not include the actual fabrication of machines. (*Id.* ¶ 29 at 27.) He points out that Cotter's witnesses were able to identify only two machines which Mr. Bakke actually designed and built. (*Id.* ¶ 15 at 8.) He also insists that the "sketches" to which Cotter refers were not technical drawings. (*Id.* ¶ 29 at 27.)

Mr. Bakke says that, throughout his tenure at Cotter, he was responsible for installing equipment; considering new equipment for possible purchase; performing cost analyses; supervising the installation of new equipment; considering ways to modify existing equipment to improve operations; reducing costs by conducting efficiency studies; training other employees; troubleshooting when problems with a particular piece of machinery or equipment developed; ensuring proper quality of the product being manufactured and of the raw materials received; supervising other employees; monitoring and responding to customer complaints; ensuring compliance with environmental regulations; conducting projects, such as the broom manufacturing project, the foam brush project, and the paint brush manufacturing automation project; and preparing reports. (*Id.* ¶ 29 at 22–27.) Cotter admits that Mr. Bakke determined how the manufacturing process should be improved and suggested new machinery to accomplish improvements, but calls these "secondary, non-engineering function[s]." (12(M) Statement ¶¶ 58–60.)

Cotter also admits that Mr. Bakke was involved with new equipment purchases and had quality control responsibilities, but emphasizes that Mr. Bakke spent a total of 10 percent of his time on these duties in 1994 and 1995. (*Id.* ¶¶ 62, 63.)

Both parties rely on Mr. Bakke to identify his job functions: Cotter, on Mr. Bakke's deposition, and Mr. Bakke, on the deposition and his affidavit. The dispute is really about the characterization of Mr. Bakke's statements and the extent to which the different duties occupied his time, particularly during 1995. A reasonable factfinder could interpret the available evidence in concert with Mr. Bakke's description of his job responsibilities.

**Mr. Bakke's Position After His Discharge**

■ Mr. Bakke next offers evidence that Messrs. Geib, Krueger, and Cygan currently perform functions he formerly performed. (12(N) Statement ¶ 29 at 29–35.) He also points to testimony in which these individuals admitted that they did not perform certain duties prior to the merger between Tru–Test and BB & R (on the heels of which Mr. Bakke was fired). For example, Mr. Krueger presently heads a team which determines whether new equipment should be purchased for integration into the manufacturing process, not something he did prior to the merger. (*Id.* ¶ 29 at 29.) Mr. Geib testified that

he currently ensures the quality of the product manufactured by the brush line, something he did not do prior to the merger. (*Id.* ¶ 29 at 30–31.) Thus, Mr. Bakke has created a factual issue as to whether Messrs. Geib, Krueger, and Cygan absorbed his former functions,[8] thereby satisfying the fourth prong of his prima facie case.[9] *Collier*, 66 F.3d at 891 (retention of younger employees, "increased responsibilities" given to one of them, and firing of plaintiff "suggest that, overall, [the defendant] did in fact treat its younger employees more favorably during the restructuring").

### Reasons for Discharge and Pretext

■ If an ADEA plaintiff succeeds in stating a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for firing the plaintiff. *Collier*, 66 F.3d at 889. Cotter articulates such a reason when it argues that Mr. Bakke was discharged because, no longer required, his position was eliminated. *Pilditch v. Board of Ed.*, 3 F.3d 1113, 1117 (7th Cir.1993) (defendant's burden is "quite light").

■ If the defendant meets his burden, to survive a summary judgment motion, the plaintiff must present evidence that the proffered reason is a pretext for discrimination.

---

8. Cotter spends much time arguing that Mr. Bakke lacked supervisory experience, while Messrs. Geib's, Krueger's, and Cygan's positions are primarily supervisory. First, the extent and the nature of Mr. Bakke's supervisory experience are disputed. Second, although Mr. Bakke suggests that Cotter could have fired Mr. Geib, Krueger, or Cygan and assigned their duties to him, *Gadsby*, 71 F.3d at 1331 ("fungibility of jobs" between discharged plaintiff and retained younger employees), this is not the thrust of the plaintiff's argument. Rather, the inference of discrimination arises if the employer argues that the plaintiff's position was eliminated because it was no longer needed, yet preserves the position by assigning the duties to the remaining employees. Therefore, even if Messrs. Geib's, Krueger's, and Cygan's positions are primarily supervisory, this does not mean that they did not absorb Mr. Bakke's duties and perform them in addition to the supervisory ones.

Cotter also insists that most of Mr. Bakke's duties were of "engineering" nature and points out that Messrs. Geib, Krueger, and Cygan do not currently perform "engineering" duties.

However, Mr. Bakke has undermined Cotter's definition of "engineering" to the extent that it means developing sketches for and building machinery. (12(M) Statement ¶¶ 5, 15, 16); *see supra*. Moreover, citing to Mr. Krueger's deposition, Cotter admits that "secondary, non-engineering functions formerly performed by Mr. Bakke ... remain at Tru–Test." (12(M) Statement ¶ 58.)

9. A small disparity of age weakens inference of discrimination. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir.1994) (marginal differences in age weaken inference of preference); *see also O'Connor*, 517 U.S. at ——, 116 S.Ct. at 1310 (prima facie case made out if mole favorably treated younger employees are "substantially younger" than plaintiff); *Roper*, 47 F.3d at 927 ("[p]reference for a 74–year–old applicant over a 75–year–old is unlikely to suffice in establishing a prima facie case"). Here, the plaintiff was 54, while Mr. Geib was 32, Mr. Krueger, 43, and Mr. Cygan, 49. However, this Circuit has not defined "substantiality." *Id.* ("Today's case is not the occasion to attempt definition of a sufficient disparity....").

*Id.* David Bigelow, the Manufacturing Manager at Tru–Test, made the decision to eliminate Mr. Bakke's position because (1) 80 percent of the plaintiff's job was "machine designing and building" and Tru–Test "had no need for that," (Bigelow Dep. at 18, 20, 25–26, 27), and (2) the decision to purchase the Polese eliminated over 70 percent of Mr. Bakke's expected duties to the year 2000 or beyond. (Bigelow Aff. ¶¶ 6, 8, 9.)

In rebuttal of the first factual underpinning, Mr. Bakke points out that Cotter's witnesses were able to identify only two machines that Mr. Bakke actually designed. (12(N) Statement ¶ 15 at 8–10.) Indeed, the testimony of David Moniz, BB & R's General Manager, is replete with admissions that BB & R's machinery was purchased from vendors, rather than designed by Mr. Bakke. (Moniz Dep. at 105–112.) Mr. Bakke also provides evidence that he performed numerous functions to which Mr. Bigelow does not refer. *See supra.*

With respect to the second factual basis, it is undisputed that during 1995, Mr. Bakke spent between seventy and seventy five percent of his time on the paint brush manufacturing automation project, (Bakke Dep. at 90–99), and that Mr. Bigelow's decision to purchase the Polese put an end to this project. However, Mr. Bakke disputes Mr. Bigelow's conclusion that discontinuing the project rendered Mr. Bakke's position superfluous. He states that throughout his tenure at BB & R, he was involved in a variety of projects such as the paint brush manufacturing automation project, after whose completion, he returned to his other duties. (12(N) Statement ¶ 29 at 25–26.) He further points out that Messrs. Geib, Krueger, and Cygan now fulfill the duties he formerly performed. *See supra.* Mr. Bakke also notes that Cotter's witnesses admitted that the Polese was not an automation *system,* but merely a *machine,* which would have automated some, but not all, paint brush manufacturing steps.[10] (12(N) Statement ¶ 18 at 13–15.) Thus, the Polese would need to be integrated into Cotter's manufacturing process, and would require oversight of its operations and the quality of the products it produced, adjustment, troubleshooting, and improvement

through the addition of other machinery or equipment. (*Id.* ¶ 25 at 19–20.) All of these are duties Mr. Bakke claims he performed for the defendant. (*Id.* ¶ 29 at 22–27.) Mr. Bakke also denies having a conversation with Mr. Bigelow, upon which the latter relies as his partial source of information on Mr. Bakke's duties, (*id.* ¶ 29 at 35–37), and disputes that the decision to acquire the Polese was arrived at prior to Mr. Bakke's discharge.

All of this evidence raises a genuine issue of material fact as to Cotter's motive in discharging Mr. Bakke. *Testerman v. EDS Technical Prods. Corp.,* 98 F.3d 297, 303 (7th Cir.1996). The facts underlying Mr. Bigelow's decision to fire Mr. Bakke are intertwined because his conclusion that the Polese eliminated the majority of Mr. Bakke's duties is based on Mr. Bigelow's characterization of Mr. Bakke's job as involving machine design and building. (Bigelow Aff. ¶¶ 3–9); *see Wolf v. Buss (America) Inc.,* 77 F.3d 914, 920 (7th Cir.1996) (where defendant offers multiple legitimate reasons for his actions and plaintiff casts doubt upon some, but not all, he nevertheless withstands summary judgment if "the multiple grounds offered by the defendant for the adverse action … are … intertwined") (quotation omitted). Although the ADEA is not a "vehicle for reviewing the propriety of business decisions, the materially conflicting evidence in this case, when viewed in the light most favorable to [Mr. Bakke], raises a question of fact as to the believability, not necessarily the propriety, of [Cotter's] purported reasons" for discharging the plaintiff. *See Courtney v. Biosound, Inc.,* 42 F.3d 414, 423 (7th Cir.1994). Therefore, Cotter's summary judgment motion with respect to the ADEA claim is denied.

### *State Law Claims*

■ Mr. Bakke alleges a breach of oral employment contract. Under Illinois law, an unwritten employment contract is presumed to be at-will. *Weeks v. Samsung Heavy Indus. Co.,* 933 F.Supp. 711, 714 (N.D.Ill. 1996), *aff'd.,* 126 F.3d 926 (7th Cir.1997) (summary judgment granted where employee admitted that employer did not guarantee

---

**10.** To date, although it has ordered the Polese, Cotter has not acquired it.

employment for fixed period and sent him letter, stating that employment would be at-will). This presumption can be overcome if the plaintiff can show that the offer of employment was (1) "clear and definite" as to the terms and duration and (2) supported by adequate consideration. *Taylor v. Canteen Corp.*, 69 F.3d 773, 782 (7th Cir.1995); *Weeks*, 933 F.Supp. at 714.

In *Taylor*, the defendant solicited the plaintiff for the position. 69 F.3d at 777. During the first meeting, the plaintiff expressed concern about losing job security guaranteed by his union membership. The defendant told him that he had "nothing to worry about." *Id.* at 782. At the second meeting, the plaintiff again raised the job security issue. The defendant said that the plaintiff could work for him "as long as [he] wished" and would have the job "until he retired or decided he did not want the job anymore." *Id.* at 783. Reversing the trial court's summary judgment in favor of the employer, the Seventh Circuit concluded that "given the language used and the context in which [the defendant's] statements were made, the alleged promise . . . was sufficiently clear and definite to preclude summary judgment." *Id.* & n. 3 (citing analogous cases).

■ The present case is similar. Mr. Bakke testified that he repeatedly expressed his concern about the security of the job at Cotter. (Bakke Dep. at 224–27.) He also testified that the following conversation took place between him and Mr. Moniz:

> Mr. Bakke: Rick, you know, I don't want—this would be my last move. I don't want to move again.
>
> Mr. Moniz:[11] This is a ground floor opportunity. It's a two and a half billion dollars a year company. It's not a fly-by-night outfit. *You can work here until you retire.*

(*Id.* at 225) (emphasis added); (*id.* at 226) (testifying that Mr. Moniz said "you can work here as long as you want"); (*id.* at 228) (testifying that Mr. Moniz said "as long as you want to you can be employed here"). *See also Farr v. Continental White Cap, Inc.*, 774 F.Supp. 522, 524 (N.D.Ill.1991) (where employer told employee that he "could re-

main with White Cap as long as he desired," promise sufficiently "clear and definite") (cited in *Taylor*, 69 F.3d at 783 n. 3).

Cotter relies on *Barnholtz v. Mobil Oil Corp.*, No. 89 C 5793, 1994 WL 468088 (N.D.Ill. Aug.24, 1994) (granting employer's summary judgment motion), where the court concluded that the employer's pre-employment interview statement that the plaintiff's "employment would continue until retirement" was "not sufficient[ly clear and definite] to create an enforceable contract," but was merely an expression of the employer's " 'goodwill' belief that [the] employee will enjoy long-term employment." *Id.* at *9. To the extent that *Barnholtz* is inconsistent with *Taylor*, the latter controls. Moreover, unlike *Taylor* and the present case, *Barnholtz* did not involve a plaintiff who repeatedly expressed concern about job security and a defendant who is alleged to have assured him that his fears were unfounded.

■ Adequate consideration is "some sacrifice . . . [the plaintiff] probably would not have made absent a guarantee of . . . permanent employment." *Smith v. Board of Ed.*, 708 F.2d 258, 263 (7th Cir.1983). "[A]bsent special circumstances, the mere relinquishment of a prior position, which must be given up in order to accept the new offer, will not" constitute adequate consideration. *Taylor*, 69 F.3d at 783. However, "in cases in which the plaintiff was lured away from a position with a promise of permanent employment, sufficient consideration may be found," because "the termination of prior employment is *specifically bargained for.*" *Id.* at 784 (emphasis added); *Molitor v. Chicago Title & Trust Co.*, 325 Ill.App. 124, 59 N.E.2d 695 (1945) (where plaintiff agreed to leave prior position only on condition that new job be permanent, relinquishment of prior position was "bargained for" and thus sufficient consideration) (cited in *Taylor*, 69 F.3d at 784). In other words, where the employee "gives up [ (1) ] a secure position elsewhere, and (2) that sacrifice is expressly made in return for the promise of permanent employment (i.e., 'specifically bargained for'), [the] courts [will] enforce an oral promise of permanent employment." *Milazzo v. O'Connell*,

---

11. Mr. Moniz denies making this or any other      statements.

925 F.Supp. 1331, 1341 (N.D.Ill.1996), *aff'd*, 108 F.3d 129 (7th Cir.1997) (no adequate consideration where plaintiff stated "only that she was promised continued employment at her existing salary in exchange for 'performing her job at the level she had performed at in the past.' ").

It is undisputed that Cotter solicited Mr. Bakke. *See Taylor*, 69 F.3d at 777. Mr. Bakke provides evidence that he had a secure position at EZ–Paintr:[12]

Q: Did you have any concern over the security of the position of your job at that time?

A: No, none whatsoever. I was getting good reviews and I was getting bonuses. In fact, out of the eight people, I believe out of the eight the only other one getting a bonus was in another department. Industrial engineering.

Q: So had you been actively looking for a new job?

A: No.

Q: In 1987 and '88?

A: No.

Q: Had you ever applied for any job in 1987 and 1988, prior to Cotter position?

A: No.

Q: Had E–Z Painter promised that you would have a position with them until you retire?

A: I was kind of just confident that I was there because of the situation.

---

**12.** Relying on *Taylor*, Cotter suggests that only something like union benefits, would constitute "specifically bargained for detriment." 69 F.3d at 784. However, in *Taylor*, the union benefit at issue *was* job security. *Id.*

**13.** Mr. Bakke testified as follows:

Q: Did you ever talk to any [recruiters] ... during '87 and '88 asking them how much the pay rate would be other than this one[, i.e., at Cotter]?

A: No. You got to understand if I wanted to leave E–Z Painter I could have left in any one given week with a job, okay. But I was just not looking for a job. I had a good job. Reasonable pay. Okay. And the only thing that really got my attention was the ground floor opportunity.

*My boss quit and he left, and I was the only one left in engineering out of eight original people. Everybody else either got canned or left.*

Q: Do you have anything in writing from E–Z Painter that guaranteed your position until you retired?

A: No, not in writing. No.

Q: Could you tell me anything that would have led you to believe that you had a position with E–Z Painter until you retired?

A: No, I wasn't concerned about it. No. No. I mean, that I would have a position until I retired. I just felt that I was doing a good job and I was getting good reviews and that was it.

Q: Is it fair to state that there was no guarantee?

A: No guarantee to anything, no, in that.

Q: Had any other company that you worked for ever promised you that you would have a position with them until you retired?

A: No. Only Cotter.

Q: Were you happy with your job at E–Z Painter?

A: Pretty happy. I am trying to be honest that there are always some areas where you could see room for change and stuff like that. But yes. It was close. I knew the people quite well. In fact, I still have contact with quite a few of them.

(Bakke Dep. at 239–40.) The excerpt of Mr. Bakke's deposition to which Cotter points does not establish that the plaintiff's position was not secure.[13]

*So I figured, well, this is the only opportunity I am going to have so—to make any kind of a career promotion, and I took it.*

Q: You state with E–Z Painter that your department was eight and at this time you were the one remaining; what happened?

A: No, no. The only one of the original eight.

Q: The original?

A: There was a turnover one or two times; they were gone. Either they quit or they got fired. Or even a couple of them got promoted.

. . . .

Q: Was the department still made up of eight employees?

A: It could have been seven. It could have been seven or eight....

(Bakke Dep. at 236–39.) Cotter quotes only the underlined portion of the deposition. The context does not support Cotter's contention that as a matter of law Mr. Bakke's EZ Paintr position was not secure.

Mr. Bakke also testified that he would not have left EZ Paintr but for Cotter's promises of permanent employment. (*Id.* at 224–25, 226–27, 241–44.) Cotter disputes this by pointing to Mr. Bakke's testimony to the effect that although he felt "too old to change jobs," when Cotter offered him a "substantial ... increase[,[14] he] jumped at it. Besides, [he] had ... a ground floor opportunity." (*Id.* at 233–34.) Cotter argues that Mr. Bakke accepted Cotter's offer solely because of the pay increase and the growth potential. However, the "ground floor" aspect of the position at Cotter is relevant to its longevity, which Mr. Bakke claims was his main concern. Moreover, it is unreasonable to expect a satisfied employee to leave his employer without being promised a more favorable situation elsewhere. Nothing in the record establishes that Mr. Bakke would have left E–Z Paintr, having been promised the pay increase and the growth potential, but not job security. In summary, Mr. Bakke has come forward with enough evidence to withstand Cotter's summary judgment motion on his breach of oral employment contract claim.

██ Finally, Mr. Cotter withstands summary judgment on his promissory estoppel claim. The evidence discussed above raises a genuine issue of material fact that (1) Cotter made an unambiguous promise to Mr. Bakke, (2) that Mr. Bakke relied on that promise, (3) that Mr. Bakke's reliance was expected and foreseeable by Cotter, and (4) that the reliance caused a detriment or injury to the plaintiff. *Quake Constr., Inc. v. American Airlines*, 141 Ill.2d 281, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (1990).

### Conclusion

For the reasons stated above, Cotter's motion for summary judgment is denied.

---

**14.** It is undisputed that Mr. Bakke's salary increased over 50 percent when he began employ-ment at Cotter.