Kevin P. BROOKS, Plaintiff,

v.

AON CORPORATION, Virginia Surety Company, Inc. n/k/a Combined Speciality Company, Inc, and Combined, Speciality Group, Inc., Defendants.

No. 03 Civ. 2385(JSR).

United States District Court,
S.D. New York.

Dec. 14, 2005.

Leily Lashkari, Paula K. Colbath, Loeb & Loeb, L.L.P., New York City, for Plaintiff.

David B. Newman, Sonnenschein Nath & Rosenthal LLP, New York City, for Defendants.

## OPINION AND ORDER

RAKOFF, District Judge.

On April 7, 2003, plaintiff Brooks sued defendants Aon Corporation and related entities (collectively "Aon") for breach of contract, fraudulent inducement of a contract, promissory estoppel, violation of New York Labor Law, and violation of ERISA. On December 11, 2003, the Court granted summary judgment to defendants as to the fraudulent inducement, Labor Law, and ERISA claims, and on March 17,

2004, the Court issued a judgment as a matter of law under Fed.R.Civ.P. 50(a) as to the remaining causes of action. Plaintiff appealed the Court's fraudulent inducement, breach of contract, and promissory estoppel rulings. On April 14, 2005, the Second Circuit affirmed the dismissal of the fraudulent inducement and breach of contract claims but vacated the promissory estoppel ruling for reconsideration in light of *Cweklinsky v. Mobil Chemical Co.*, 364 F.3d 68 (2d Cir.2004). *See Brooks v. Aon*, 128 Fed.Appx. 807, 808, 2005 WL 858049 (2d Cir.2005).

On remand, the Second Circuit asked this Court to consider

(1) whether *Stewart*[1] either in itself or as applied by [the Second Circuit] in *Cweklinsky* [sic], suggests that a difference exists between Illinois law and Connecticut law with respect to the doctrine of promissory estoppel; (2) if there is such a difference, whether that difference would lead to a different result in this case; and (3) if a different result would obtain under Illinois or Connecticut law, which law the New York Court of Appeals would apply. In addition, the court should reconsider, given the applicable law and the record before it, its previous conclusion that a promissory estoppel claim requires that "a promise itself must be at least of the specificity that would support an oral contract," in light of *Cweklinsky*, 364 F.3d at 78 (evi-

dence required to support a claim of promissory estoppel is not identical to that required to support a claim of breach of implied contract), *Stewart*, 267 Conn. at 104, 837 A.2d 736 (fundamental element of promissory estoppel is existence of a "clear and definite promise"), and *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 310, 152 Ill.Dec. 308, 565 N.E.2d 990 (1990) (promissory estoppel under Illinois law requires proof of "an unambiguous promise," and recovery "on a theory of promissory estoppel [is possible] despite the absence of a contract").

*Id.* at 808–09.[2] The parties briefed these questions for the Court, and oral argument was heard on September 27, 2005.

The enumerated items are easily addressed, since, as to Question 1, both parties now agree there is no difference between Connecticut and Illinois law regarding promissory estoppel doctrine. *See* Defendants' Memorandum of Law in Support of the Dismissal of Plaintiff's Promissory Estoppel Claim ("Def.Mem.") at 10–11; Memorandum in Opposition to Dismissal of Plaintiff's Promissory Estoppel Claim ("Pl.Mem.") at 10–12.[3] This also moots questions 2 and 3. Accordingly, the remaining question before this Court is whether the plaintiff's claim, as a matter of law, meets the proper standard for promissory estoppel under the uniform law of Illinois/Connecticut.[4] For

---

**1.** *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 837 A.2d 736 (2003).

**2.** The Court of Appeals also stated that this Court "is also free ... to consider any other issues not inconsistent" with the Second Circuit's remand. *Brooks*, 128 Fed.Appx. at 809.

**3.** The Court notes—although neither party has raised the issue—that the Fifth District of the Illinois Appellate Court has held a claim for promissory estoppel "is available only as a defense ..., not as a cause of action." *DeWitt*

*v. Fleming*, 357 Ill.App.3d 571, 293 Ill.Dec. 446, 828 N.E.2d 756, 758 (2005); *see also ESM Dev. Corp. v. Dawson*, 342 Ill.App.3d 688, 277 Ill.Dec. 30, 795 N.E.2d 397, 402 (2003). There appears to be no corollary authority in Connecticut. However, in light of what follows below, the Court need not reach this issue.

**4.** On March 15, 2004, this Court ruled that Brooks's promissory estoppel claim was governed by the laws of Connecticut and Illinois. *See* Tr., Mar. 15, 2004, at 47–48. Although

the following reasons, the Court concludes it does not.

The relevant facts (taken for these purposes most favorably to plaintiff) are as follows. Prior to going to work for Aon, Brooks was President and CEO of General Star Management Company, a division of the General Re Corp. ("Gen Re"), for more than thirty years. Gen Re terminated Brooks on March 12, 2001 and offered him a Severance Agreement conditioned on Brooks's agreeing to a two-year non-competition provision. *See* Pl. Mem. at 3–4. Brooks placed a value of $2.45 million on Gen Re's proposal, an amount he reached by combining the severance payments and lump sum bonus he was to receive with the value of the stock options offered to him at the time he left Gen Re (even though these stock options would not vest or be paid until after Brooks satisfied the terms of the non-compete clause some two years later). *See* Trial Tr., Mar. 16, 2004, at 130–34.

On March 22, 2001, Brooks met with Aon's President and Chief Operating Officer, Michael O'Halleran regarding his possibly going to work for Aon. At the meeting, according to Brooks, O'Halleran told Brooks that Aon was planning a still-private strategic restructuring that would involve the creation of a new company and that Aon thought Brooks was well-suited to become the new company's lead executive. *See id.* at 53–56. Brooks told O'Halleran that he already had a "two and a half million dollar offer" from General Re, to which O'Halleran replied, "we can do that, we can match that. That's not a problem." *Id.* at 54. Based on this response, Brooks permitted the Gen Re offer to expire on April 3, 2001, *id.* at 143, and continued

"serious" employment negotiations with Aon, as well as two other insurance companies. *Id.* at 143, 163.

On April 30, 2001, Brooks, O'Halleran, and Aon's CEO Patrick Ryan met to discuss the specifics of Aon's new strategic plan (the details of which had been publicly released on April 23, 2001) and Brooks's potential role in it. Brooks was told generally that his compensation would include salary, bonus, and stock options, but no one from Aon "put numbers on the compensation package." *Id.* at 65. Brooks states, however, that O'Halleran, in front of Ryan, repeated the promise to match Brooks's Gen Re offer: "Mike reminded me ... [w]hat you have is covered and matched." *Id.* Brooks told Ryan that if he accepted a position, he would work for at least five years. *Id.* at 177.

On May 7, 2001, Brooks had a further meeting with Ryan, at which some specific numbers were finally discussed. Initially, Ryan offered Brooks an annual salary of $300,000. Brooks turned down this offer the next day, telling O'Halleran "400,000 is the number that I am going to be working for, not 300,000, so I will not be accepting the job at 300,000." *Id.* at 71. But when Aon subsequently agreed to guarantee Brooks $400,000 for his first year through a combination of salary and guaranteed bonus, *id.* at 72, Brooks accepted the offer. *Id.* at 76–77. He began work at Aon on May 14, 2001, *id.* at 78, and was terminated in February 2002. *Id.* at 103.

In his promissory estoppel claim, Brooks contends that O'Halleran's twice-stated promise to match the Gen Re offer requires Aon to pay Brooks the value of that offer: $2.45 million. *Id.* at 142. In previously dismissing this claim as a matter of

defendants now argue that the New York Court of Appeals would apply New York law to this claim, *see* Def. Mem. at 19–25, defendants present no new evidence on the issue of

Mr. Brooks's contacts with all three states. Thus, the Court adheres to its prior ruling and applies Connecticut and Illinois law to the claim before it.

law, the Court interpreted the law of Connecticut and Illinois to require in cases of promissory estoppel that the "promise itself ... be at least of the specificity that would support an oral contract." Trial Tr., Mar. 17, 2004, at 240.

◼ As the Court of Appeals intimated in its remand opinion, this conclusion was erroneous. The Connecticut Supreme Court, in particular, has held that in promissory estoppel cases generally, "[a]lthough the promise must be clear and definite, it need not be the equivalent of an offer to enter into a contract because '[t]he prerequisite for ... application [of the doctrine of promissory estoppel] is a *promise* and not a bargain and *not* an *offer.*'" *Stewart*, 837 A.2d at 742 (quoting 3 A. Corbin, Contracts § 8.9, at 29 (rev. ed.1996)). And, as noted, the parties are now agreed that Illinois law is effectively identical to that of Connecticut.

◼ After *Stewart*, the elements of promissory estoppel in Connecticut are that the defendant have made a "clear" and "definite" promise that was reasonably expected to induce reliance and upon which the plaintiff did, in fact, detrimentally rely. *Stewart*, 837 A.2d at 742. Likewise, in Illinois, the elements of promissory estoppel are an unambiguous promise by the defendant upon which plaintiff reasonably and foreseeably relied to the plaintiff's detriment. *Quake Const., Inc. v. Am. Airlines, Inc.*, 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990, 1004 (1990).

◼ However, in both jurisdictions, application of these requirements is very much affected by context. As *Stewart* itself noted, where the context is that of "an entirely new employment contract," more may be necessary to meet these requirements than would be necessary in a narrower context. *Stewart*, 837 A.2d at 745. Thus, the Connecticut Supreme Court in

*Stewart*, while disclaiming the suggestion in its earlier opinion in *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 520 A.2d 217 (1987), that "for purposes of a claim of promissory estoppel, the promise upon which the promissee relies must be no less specific and definite than an offer to enter into a contract," *Stewart*, 837 A.2d at 744, went on to reaffirm the conclusion in *D'Ulisse–Cupo* that the promises there given of a future teaching position involving specific courses and curricula were, as a matter of law, "insufficiently promissory and definite" to support a promissory estoppel claim. *Id.*

Similarly, in such circumstances, Illinois requires a comparable level of definiteness. *See Sembos v. Philips Components*, 376 F.3d 696, 704 (7th Cir.2004) (affirming summary judgment under Illinois law on breach of contract and promissory estoppel claims because defendant "did not promise Sembos any specific position, salary, or other terms of employment," and thus "the alleged promises were too indefinite, as a matter of law").

◼ Here, O'Halleran's twice-made statement that Aon would "match" the value of Brooks's Gen·Re offer does not reach the level of definiteness required by both Connecticut and Illinois in this context. In the first such statement, on March 22, O'Halleran said, at most, that if the expected position opened up and if it was offered to Brooks, it would not be "a problem" for Aon to "match" Gen Re's $2.45 million offer to Brooks. *See* Trial Tr., *supra.* No employment offer was made. *Id.* at 108. Brooks was given no specifics whatever regarding the position to be offered beyond that it would be a "very senior [and] high-level," *Id.* at 56. In turn, Brooks relayed the $2.45 million severance package from Gen Re to O'Halleran in the most broad terms: "I said to Mr. O'Halleran that I had a package at a value of, and I

expressed that number [as] 2.4 million and that had included two years of continuation of salary and the lump sum bonus at the end of two years." *Id.* at 142–43. Brooks left the March 22 meeting without any knowledge of what his job title or duties might be, what the new company might look like, or what his salary or long-term compensation terms might be, if the job were offered at all. *See id.* at 56, 166.

Given this lack of detail, the "promise" made on March 22 was even less definite than the promise of a new teacher position found legally insufficient in *D'Ulisse–Cupo*, 520 A.2d at 221, or the promise of a new position with specified pension benefits or retention of plaintiff's current job found legally insufficient in *Sembos.* *See* 376 F.3d at 704.

O'Halleran's repetition of the "match" statement on April 30, 2001 fares no better. It is true that, by this point, Brooks knew what position he was being offered, had discussed Aon's proposed overall salary structure, and had proposed that he make a 5–year commitment. Nevertheless, the April 30 promise to match the value of Gen Re's offer is too indefinite to enforce because, *inter alia*, Brooks and Aon had no discussions whatsoever regarding what "matching" the $2.45 million offer might mean in this context. Brooks did not know whether the $2.45 million was to be included in the basic framework of salary, bonus, and stock options, whether it was to be a separate severance agreement, or over what period the money would be paid to him. *See* Trial Tr., Mar. 16, 2004, at 73, 120–21, 151, 172–73, 179. Indeed, he never asked Aon for clarification as to how Aon was going to pay him the promised $2.45 million at any time. *Id.* at 120–21.[5]

■ Moreover, even assuming *arguendo* that O'Halleran's April 30 statement was sufficiently clear and definite to meet the foregoing standards, there is no material evidence that Brooks detrimentally relied on it or that any such reliance, if it existed, was reasonable. As noted, Brooks let his Gen Re offer expire well before the April 30 meeting; thus, his sole claim of detrimental reliance on the April 30 promise relates to his decision to end employment negotiations with an Aon competitor after accepting his offer with Aon. *See id.* at 101; Pl. Mem. at 8, 21–22. But there is no evidence that O'Halleran's promise to match was a material factor in this decision. Specifically, when twice asked, on his direct examination, why he accepted the Aon offer over that of Aon's competitor, Brooks did not identify compensation as having played a role in his decision making, citing instead greater satisfaction with the responsibilities and autonomy he would be given at Aon. *See* Trial Tr., Mar. 16, 2004, at 101–02.[6] Moreover, Brooks, by his own admission, was willing to turn down Aon's offer unless he was paid more than $300,000 in annual salary, even after he had let Gen Re's offer lapse and despite O'Halleran's promise to match.

■ Finally, even if the evidence did somehow show that Brooks would have

---

5. Brooks asserts he repeatedly asked for written information regarding the terms of his benefits in the event of a change of circumstances, termination, or disability. *See id.* at 76–77, 79–80, 123–127, 277 Ill.Dec. 30, 795 N.E.2d 397. But this persistence only reinforces the central point that key elements were left wholly undefined by O'Halleran's vague statement to "match" Gen Re's offer.

6. Plaintiff's counsel, seemingly unhappy with these answers, then asked Brooks directly the leading question of "Did your compensation package at Aon play any role in your decision?", but even then Brooks made no specific reference to the "matching" in his answer, saying only that "Yes. A, I wanted the job; and B, the compensation was clearly an inducement and one that was entirely satisfactory to me. So the answer is, yes, it did." Trial Tr., Mar. 16, 2004, at 103.

accepted employment with Aon's competitor rather than with Aon had O'Halleran not made his promise, such reliance would have been unreasonable, since no one at Aon had even seen Brooks's Gen Re offer when making the promise to match, nor did they ever request to do so. *Id.* at 182. Thus, any statement purporting to agree to match its value was based solely on Brooks's representations as to both the components of the agreement and their valuations. No reasonable fact-finder could find that a sophisticated senior executive such as Brooks could reasonably believe that the two most senior executives of a large insurance corporation would agree to match an offer that would require it to pay one of its employees $2.45 million without first requesting to verify that offer's terms.

Accordingly, defendants' renewed motion to dismiss as a matter of law is hereby granted, and plaintiff's remaining claim for promissory estoppel is dismissed with prejudice. Clerk to enter judgment.

SO ORDERED.